740 So.2d 1205 (1999)
UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellant/Cross-Appellee,
v.
John G. PHILLIPS, individually and as Personal Representative of the Estate of Wanda Phillips, Deceased, Appellee/Cross-Appellant.
No. 97-02462.
District Court of Appeal of Florida, Second District.
July 30, 1999.
Rehearing Denied September 23, 1999.
Kimberly A. Staffa and David J. Abbey of Fox, Grove, Abbey, Adams, Byelick & Kiernan, L.L.P., St. Petersburg, for Appellant/Cross-Appellee.
Roy L. Glass of Law Offices of Roy L. Glass, P.A., St. Petersburg, for Appellee/ Cross-Appellant.
NORTHCUTT, Judge.
This controversy centers on United Services Automobile Association's denial of uninsured motorist benefits claimed by John Phillips, who is the son of Wanda Phillips and the personal representative of her estate. Mrs. Phillips died after being struck by a bus owned by the Pinellas Suncoast Transit Authority. On cross motions for summary judgment, the circuit court issued a final declaratory judgment holding that there was uninsured motorist coverage even though the policy's definition of "uninsured" excluded vehicles owned by government entities or by self-insurers. The court also determined that *1206 under the circumstances of this case, no benefits are payable under the policy unless the claimant's damages exceed $2.1 million. USAA appeals the former ruling, which we affirm. Phillips cross-appeals the latter ruling, which we reverse.
At the time of the accident on June 30, 1996, Phillips and his mother were insured under a USAA automobile insurance policy with uninsured motorist limits of $100,000 per person/$300,000 per occurrence. The Authority, a government entity, had a liability insurance policy obtained through the Florida League of Cities. It contained an excess endorsement providing $2 million in coverage for claims exceeding a retained limit of $100,000, the cap on the damages the Authority could be required to pay under the limited sovereign immunity waiver contained in section 768.28, Florida Statutes (1995). The excess endorsement provided that it was "solely for any liability resulting from entry of a claims bill pursuant to [s]ection 768.28(5), Florida Statutes...."
Following the accident, the Authority offered to settle with Phillips for its retained limit of $100,000. When Phillips notified USAA of the offer, it denied coverage, thus waiving any objection to the settlement. Phillips subsequently executed a release that extinguished any liability on the part of the Authority, its bus driver, and the Florida League of Cities.
Phillips then sought uninsured motorist benefits under the USAA policy. USAA rejected the claim, citing policy exclusions for any vehicle or equipment that is "owned or operated by a self-insurer under any applicable motor vehicle law" or "owned by any governmental unit or agency." Litigation ensued, resulting in the order before us.
When ruling that there was coverage under the policy, the circuit court followed our decision in Johns v. Liberty Mut. Fire Ins. Co., 337 So.2d 830 (Fla.2d DCA 1976). In that case, which involved a city-owned vehicle, we held that it was legally impermissible to exclude government vehicles from uninsured motorist coverage. We explained that the "uninsured motorist statute was enacted to provide relief to innocent persons who are injured through the negligence of an uninsured motorist, and such liability is not to be `whittled away' by exclusions and exceptions." Id. at 831 (citations omitted).
USAA argues that Johns itself has been whittled away at the hands of the courts. To a degree, this is true. In Johns, we rejected the uninsured motorist insurer's argument that it could exclude accidents involving government-owned vehicles because government entities were exempt from compliance with the financial responsibility law. "There is no reason to read the exclusion of government-owned vehicles in the financial responsibility law in pari materia with the uninsured motorist statute." Johns, 337 So.2d at 831. But the Florida Supreme Court did refer to the financial responsibility law when deciding the uninsured motorist coverage dispute in Carguillo v. State Farm Mut. Auto. Ins. Co., 529 So.2d 276 (Fla.1988). That case, which involved a collision between two off-road motorcycles in an open field, placed in issue the validity of an uninsured motorist policy exclusion for vehicles "designed for use mainly off public roads." The supreme court ruled that the exclusion was permissible because the financial responsibility law, chapter 324, defines "motor vehicle" as a vehicle "designed and required to be licensed for use upon a highway."[1] The court held that a *1207 vehicle designed primarily for off-road use can be excluded from uninsured motorist coverage "because it is not a `motor vehicle' within the definition of the financial responsibility law." Carguillo, 529 So.2d at 278.
We do not understand Carguillo to mean that uninsured motorist insurers may exclude all conveyances that are not subject to the financial responsibility law. Unlike the off-road motorcycle involved in that case, government-owned vehicles are not per se outside the definition of motor vehicle for purposes of chapter 324. Rather, they are "exempt from the operation" of the chapter by virtue of section 324.051(2)(a)2., Florida Statutes (1995), a subsection of the statute that otherwise calls for the suspension of licenses and registrations of operators and owners of motor vehicles involved in accidents.
Vis-a-vis the public policies behind the financial responsibility law and the uninsured motorist statute, there is an enormous difference between Carguillo and this case. By its very nature, the off-road vehicle involved in Carguillo posed far less danger to the public than the vehicles included in the legislature's definition of "motor vehicle." Here we are dealing with a vehicle which falls squarely within that definition. It is as dangerous to the public as any other vehicle designed for use on the highways, regardless of the happen-stance of its ownership. We believe the public policy exception that permits an uninsured motorist coverage exclusion for the former simply is inapplicable to the latter. Moreover, we discern no other reason, in law or public policy, for permitting the exclusion of government-owned vehicles from uninsured motorist coverage. See Johns, 337 So.2d at 831.[2]
We also approve the circuit court's determination that the Authority was not a self-insurer. In so holding the circuit court again followed Johns, in which we declined to decide the validity of the self-insurer exclusion because the tortfeasor had not obtained a certificate of self-insurance in accordance with section 324.171.[3] Likewise, here the Authority had not obtained a certificate of self-insurance.
USAA argues that in this regard Johns was overruled by subsequent legislation amending the sovereign immunity waiver statute to permit government entities to self-insure. See § 768.28(15), Fla. Stat. (1995). Indeed, in Gabriel v. Travelers Indem. Co., 515 So.2d 1322 (Fla. 3d DCA 1987), the Third District read that provision in pari materia with the financial responsibility law, and concluded that a government tortfeasor may be a self-insurer *1208 without obtaining a certificate of self-insurance. Gabriel disagreed with Johns to the extent that Johns suggested otherwise.
USAA urges us to recede from Johns and adopt the reasoning of Gabriel. But under the circumstances of this case the question is academic, for the undisputed facts of record demonstrate that even under the Gabriel holding the Authority was not a self-insurer. As USAA has reminded us, self-insurance is
a planned program of paying from a company's own funds for losses sustained, where it recognizes reasonably the potential losses that might be incurred, does all that it can to avoid or reduce this potential, and then provides a means to process and pay for the losses remaining.... A true self-insurance plan contemplates the establishment of a fund based on projections of future losses and the identification and measurement of actual claims against the self-insured entity so that money from the fund may be set aside to pay those claims if and when they come due.
Thomas W. Raynard, The Local Government as Insured or Insurer, 20 The Urban Lawyer 103 (1988).
The tortfeasor in Gabriel, the City of Miami, satisfied that definition. It had established a self-insurance program administered by its risk management department, which paid claims from monies set aside for that purpose in a trust fund.[4] Although the Authority engaged in risk management and administered claims within its $100,000 retained limit, it did not consider itself a self-insurer. To the contrary, it treated the retained limit as a deductible against its liability policy. Accordingly, it had not established a fund for the payment of claims. Instead, each year it included anticipated payments in its annual operating budget.
The fact that the Authority retained responsibility for claims up to $100,000 did not make it a self-insurer. See Zeichner v. City of Lauderhill, 732 So.2d 1109, 24 Fla. L. Weekly D477 (Fla. 4th DCA 1999) (holding that city's $75,000 retained limit did not render it a self-insurer). Nor do we believe that the Authority became a self-insurer simply because it administered and budgeted for claims within that limit. For the foregoing reasons, we affirm the circuit court's determination that there was uninsured motorist coverage under the USAA policy.
We disagree with the circuit court's holding that no benefits are payable unless Phillips's damages exceed $2.1 million, the sum of the Authority's retained limit and the excess endorsement under the Florida League of Cities policy. That ruling was premised on the court's conclusion that the $2 million excess coverage was "available" to Phillips as contemplated by the following provision in the uninsured motorist statute:
The coverage described under this section shall be over and above, but shall not duplicate, the benefits available to an insured under any workers' compensation law, personal injury protection benefits, disability benefits law, or similar law; under any automobile medical expense coverage; under any motor vehicle liability insurance coverage; or from the owner or operator of the uninsured motor vehicle or any other person or organization jointly or severally liable together with such owner or operator for the accident; and such coverage shall cover the difference, if any, between the sum of such benefits and the damages sustained, up to the maximum *1209 amount of such coverage provided under this section.
§ 627.727(1), Fla.Stat. (1995).
There is scant authority on the meaning of the term "available" in this context. But under the doctrine of noscitur a sociis, the meaning of statutory terms and the legislative intent behind them may be discovered by taking them in the context of words associated with them in the statute. See, e.g., Cepcot Corp. v. Dep't of Bus. and Prof'l Regulation, 658 So.2d 1092 (Fla. 2d DCA 1995). It is telling, then, that each source of "available" benefits listed in the statute entails a legally enforceable right to recover which arises upon the occurrence resulting in the insured's injury.
Under the Authority's excess policy, however, no enforceable right to benefits arises upon an occurrence. The policy declares that its benefits are payable only if the legislature passes a claims bill enacting a private relief act. Unlike civil judgments, private relief acts are not obtainable by right upon the claimant's proof of his entitlement. Private relief acts are granted strictly as a matter of legislative grace. See Gamble v. Wells, 450 So.2d 850 (Fla.1984). Moreover, the beneficiary of such an act would recover by virtue of its enactment, regardless of whether the government tortfeasor had purchased insurance for the purpose of paying it. We conclude that there were no "benefits available" to Phillips under the Authority's excess policy, as contemplated in the uninsured motorist statute. Therefore, we reverse the final declaratory judgment insofar as it holds that Phillips may not recover uninsured motorist benefits under the USAA policy unless his damages exceed $2.1 million.
Affirmed in part, reversed in part, remanded for further proceedings.
FULMER, A.C.J., and WHATLEY, J., Concur.
NOTES
[1] Section 324.021(1), Florida Statutes (1995). defines "motor vehicle" as "[e]very self-propelled vehicle which is designed and required to be licensed for use upon a highway, including trailers and semitrailers designed for use with such vehicles, except traction engines, road rollers, farm tractors, power shovels, and well drillers, and every vehicle which is propelled by electric power obtained from overhead wires but not operated upon rails, but not including any bicycle or moped. However, the term `motor vehicle' shall not include any motor vehicle as defined in s. 627.732(1) when the owner of such vehicle has complied with the requirements of ss. 627.730-627.7405, inclusive, unless the provisions of s. 324.051 apply; and, in such case, the applicable proof of insurance provisions of s. 320.02 apply."
[2] USAA contends that we implicitly recognized the validity of government vehicle exclusions in Comesanas v. Auto-Owners Ins. Co., 700 So.2d 118 (Fla. 2d DCA 1997), when we affirmed a judgment for the insurer under a policy containing exclusions for vehicles owned by government entities and by self-insurers. But a closer reading of Comesanas demonstrates that it was based solely on the self-insurer exclusion. It relied on Amica Mutual Ins. Co. v. Amato, 667 So.2d 802 (Fla. 4th DCA 1995), which involved a self-insurer exclusion, not a government vehicle exclusion. We concluded that "the relevant policy provision and Hartline's status as a self-insurer are indistinguishable from the relevant elements deemed controlling in Amica." Comesanas, 700 So.2d at 118.
[3] Following our decision in Johns v. Liberty Mut. Fire Ins. Co., 337 So.2d 830 (Fla. 2d DCA 1976), other courts have approved the self-insurer exclusion, see Amica Mut. Ins. Co. v. Amato, 667 So.2d 802 (Fla. 4th DCA 1995); Gabriel v. Travelers Indem. Co., 515 So.2d 1322 (Fla. 3d DCA 1987). In Comesanas v. Auto-Owners Ins. Co., 700 So.2d 118 (Fla.2d DCA 1997), we implicitly approved the exclusion when we announced our agreement with Amato. Since that time, however, we have certified as being of great public importance the question whether the self-insurer exclusion is permissible under Florida law and public policy. See Young v. Progressive Southeastern Ins. Co., 712 So.2d 460 (Fla. 2d DCA 1998), review granted, 728 So.2d 206 (Fla. 1998).
[4] In Gabriel v. Travelers Indem. Co., 515 So.2d 1322, 1324 (Fla. 3d DCA 1987), the court noted that fact: "The stipulated record before us disclosed that the City is financially responsible. It states:

6. The City of Miami Risk Management Department administers the City of Miami Self-Insurance Program by which the City defines itself as "self-insured" for claims against the City. The City considers itself a self-insured municipal corporation provided by Article VI in the Finance Section of the City of Miami Code, Sections 1893-18104 entitled `Self Insurance and Insurance Trust Fund.'"