777 So.2d 1027 (2000)
ALLSTATE INSURANCE COMPANY, a foreign corporation doing business in the State of Florida, Appellant,
v.
Joe M. RUSH, Pamela Rush, and Maria A. Montenegro, Appellees.
No. 4D99-3004.
District Court of Appeal of Florida, Fourth District.
December 27, 2000.
Rehearing Denied February 27, 2001.
*1028 Richard A. Sherman and Rosemary B. Wilder of Law Offices of Richard A. Sherman, P.A., Fort Lauderdale, and Thaddeus M. Hartmann of Dickstein, Reynolds & Woods, West Palm Beach, for appellant.
Richard J. Slinkman of Slinkman & Slinkman, P.A., and Bard D. Rockenbach of Sellars, Marion & Bachi, P.A., West Palm Beach, for appellees.
PER CURIAM.
In this personal injury action, Joe and Pamela Rush settled with one of three tortfeasors for less than the tortfeasor's policy limits. They then obtained a favorable judgment against the remaining two uninsured tortfeasors and Allstate Insurance Company (Allstate), their own uninsured motorist (UM) carrier. The trial court refused to set off the first tortfeasor's policy limits from this latter verdict and entered judgment accordingly. Allstate appeals from this judgment. We hold the trial court erred by failing to set off a portion of the underinsured tortfeasor's policy limits from the total damages award and reverse.

Background
This case involved a multi-vehicle accident. The Rushes' automobile was forced to stop suddenly when a vehicle driven by Ms. Montenegro cut in front of them. Stopping suddenly caused the Rushes to get rear-ended by a vehicle driven by Mr. Aiello, who was then hit from behind by a vehicle driven by Ms. Buchholz. When Ms. Buchholz hit Mr. Aiello, Mr. Aiello's vehicle hit the Rushes' car for a second time.
The Rushes sued the above tortfeasors and Allstate, their own UM carrier,[1] since Mr. Aiello and Ms. Montenegro were both uninsured, as a result of injuries each sustained during the above accident. Prior to trial, the Rushes settled with Ms. Buchholz and her insurance carrier, GEICO, for $14,000, even though her policy limits were $100,000. The settlement did not allocate the monies between Mr. and Mrs. Rush. The Rushes did not obtain Allstate's permission *1029 to settle with GEICO for $14,000.[2] The Rushes then released GEICO and Ms. Buchholz from any future liability. They did not receive Allstate's permission to release these two parties.
Before trial, Mr. Rush voluntarily dismissed his personal injury claim. Allstate and the Rushes agreed to handle all collateral source issues after trial. After trial, the jury found Ms. Montenegro 55% negligent, Mr. Aiello 30% negligent, and Ms. Buchholz 15% negligent. It awarded Mrs. Rush $60,240.90, broken down as follows: $20,818.90 for past medical expenses; $17,500 for future medical expenses; $8,960 for past lost earnings; $4,200 for future earnings; $1,536 for past pain and suffering; and $7,200 for future pain and suffering.
Thereafter, Allstate filed a motion for a collateral source determination. It alleged that, under Florida Statutes, section 627.727(6)(c) (1993), it should receive a setoff of $100,000 (Ms. Buchholz's policy limits with GEICO) against the entire jury award. At the hearing that followed, Allstate also argued that the unauthorized settlement prejudiced its subrogation rights with respect to Ms. Buchholz because the Rushes executed a general release in her and GEICO's favor. The Rushes, relying on Florida Statutes, section 768.81 (1993), countered that had Ms. Buchholz remained a defendant in the trial, she would have been liable for only 15% of the noneconomic damages. As such, they posited that Allstate's argument, that the court should nevertheless set off the verdict by $100,000 and enter a judgment of $0, was absurd.
The trial court sided with the Rushes. It found that although the Rushes' settlement with Ms. Buchholz was obtained without Allstate's authority or consent, Allstate was not prejudiced because Buchholz's responsibility for Mrs. Rush's total damages was only 15%, an amount less than the settlement. The court explained,
I don't see that there is any prejudice... because it was a fourteen thousand dollar settlement, and this lady was only fifteen percent negligent, and when you run the figures on that with the settlement or with the jury verdict awards, it doesn't appear to me like there was any prejudice to Allstate....
It then granted Allstate a 15% set-off plus the $10,000 already paid in PIP benefits, for a total judgment to the Rushes of $42,682.66. The court held that Allstate was not entitled to a $14,000 set-off against Mrs. Rush's judgment because the settlement did not allocate the $14,000 amount between Mr. and Mrs. Rush's injuries. It then entered final judgment against Allstate, jointly and severally with the other tortfeasors,[3] for $42,682.66.

Merits
Allstate argues that because Mrs. Rush had available to her Ms. Buchholz's policy limits with GEICO of $100,000, and because her total damages were only $60,240.90, her UM coverage was not triggered. As this issue presents a question of law, see Lobry v. State Farm Mut. Auto. Ins. Co., 398 So.2d 877, 879 (Fla. 5th DCA 1981)(holding issues pertaining to insurance coverage are questions of law), our standard of review is de novo. Rittman v. Allstate Ins. Co., 727 So.2d 391, 393 (Fla. 1st DCA 1999).
Allstate's appeal involves the interplay of the various provisions of section 627.727, which provides the following:
(1) ... The coverage described under this section shall be over and above, but shall not duplicate, the benefits available to an insured under any ... motor vehicle liability insurance coverage; ... or *1030 [from] any other person or organization jointly or severally liable together with such owner or operator for the accident; and such coverage shall cover the difference, if any, between the sum of such benefits and the damages sustained, up to the maximum amount of such coverage provided under this section. The amount of coverage available under this section shall not be reduced by a setoff against any coverage, including liability insurance....
* * * *
(3) For the purpose of this coverage, the term "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle when the liability insurer thereof:
* * * *
(b) Has provided limits of bodily injury liability for its insured which are less than the total damages sustained by the person legally entitled to recover damages....
* * * *
(6)(a) If an injured person ... agrees to settle a claim with a liability insurer and its insured, and such settlement would not fully satisfy the claim for personal injuries ... so as to create an underinsured motorist claim, then written notice of the proposed settlement must be submitted by certified or registered mail to all underinsured motorist insurers that provide coverage....
* * *
(c) The underinsured motorist insurer is entitled to a credit against total damages in the amount of the limits of the underinsured motorist's liability policy in all cases to which this subsection applies, even if the settlement with the underinsured motorist under paragraph (a) or the payment by the underinsured motorist insurer under paragraph (b) is for less than the underinsured motorist's full liability policy limits. The term "total damages" as used in this section means the full amount of damages determined to have been sustained by the injured party, regardless of the amount of underinsured motorist coverage. Nothing in this subsection, including any payment or credit under this subsection, reduces or affects the total amount of underinsured motorist coverage available to the injured party.
§ 627.727(1),(3)(b),(6)(a),(c), Fla.Stat. (1993) (emphasis supplied).
Allstate argues that subsection(6)(c) authorized it to receive a credit against the entire jury award in the amount of Ms. Buchholz's total policy limits ($100,000) even though the Rushes settled with her for much less, and even though her liability for Mrs. Rush's noneconomic damages was only 15% of the award. The Rushes counter that had they not settled with Ms. Buchholz, the most Allstate would have been able to collect from her with respect to Mrs. Rush's noneconomic damages was $1,310.40, or 15% of the jury's award. They conclude that because only 15% of Ms. Buchholz's policy benefits was available as to these damages, Allstate should not receive a credit as against the remaining 85% of the award.
Uninsured motorist coverage was defined by the legislature in 1979 as that which is over and above, but does not duplicate, the "benefits available" to an insured from, among other sources, the owner or operator of the uninsured motor vehicle or any other person jointly or severally liable together with such owner or operator for the accident. § 627.727(1), Fla.Stat. (1979). While the statute did not define what the legislature meant by "benefits available," the supreme court explained that the purpose of the subsection was to allow insureds the same recovery which would have been available to them had the tortfeasor been insured to the same extent as the insureds themselves. Dewberry v. Auto-Owners Ins. Co., 363 So.2d 1077 (Fla.1978). In fact, and although the statute has been amended a number of times, mostly in the last fifteen *1031 years, these overriding policy concerns have largely remained consistent in all the variations. See, e.g., Allstate Ins. Co. v. Boynton, 486 So.2d 552, 557 (Fla.1986); Johns v. Liberty Mut. Fire Ins. Co., 337 So.2d 830, 831 (Fla. 2d DCA 1976).
In 1992, the legislature substantially amended what is now subsection (6).[4] The purpose of the amendment was to address the situation in which an injured party was denied immediate access to needed compensation from a tortfeasor's liability carrier because the injured party's UM carrier refused to approve a settlement offer and waive its subrogation rights. Fla. H.R. Comm. on Ins., CS for HB 93-H (1992) Staff Analysis 29 (July 10, 1992)(on file with comm.). Where settlement with an underinsured tortfeasor was unauthorized, subsection (6)(c), as amended, expressly gave the UM carrier a credit against the injured plaintiff's total damages in the amount of the limits of the underinsured tortfeasor's liability policy. § 627.727(6)(c), Fla.Stat. (Supp.1992). The credit applied across the board without regard to whether the settlement was for less than the tortfeasor's policy limits, and without regard to whether the damages which it offset were economic or noneconomic in nature.
Following this amendment, the court upset the mix when it issued Fabre v. Marin, 623 So.2d 1182 (Fla.1993) and Wells v. Tallahassee Memorial Regional Medical Center, Inc., 659 So.2d 249 (Fla.1995). Fabre involved the interpretation of the Tort Reform Act, section 768.81(3), Florida Statutes (Supp.1988), which provided, in pertinent part:
(3) Apportionment of damages.In cases to which this section applies, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability; provided that with respect to any party whose percentage of fault equals or exceeds that of a particular claimant, the court shall enter judgment with respect *1032 to economic damages against that party on the basis of the doctrine of joint and several liability.
The court in Fabre held that by enacting this statute the legislature intended to limit liability for noneconomic damages to the defendant's percentage of fault as compared to all other entities that contributed to the accident regardless of their solvency, and regardless of whether they have been or could have been joined as defendants. 623 So.2d at 1185. It later clarified that set-off statutes apply only where there is common liability, as in the case of economic damages. Wells, 659 So.2d at 253.
Fabre and Wells altered the application of the term "benefits available" as defined in section 627.727(1). See Yablon v. N. River Ins. Co., 654 So.2d 1033, 1035 (Fla. 4th DCA 1995)(recognizing that when the legislature enacted section 627.727(1), it did not contemplate the abrogation of joint and several liability with respect to noneconomic damages). Specifically, since tortfeasors now are not jointly and severally liable for all damages, what benefits are truly "available" to an insured under section 627.727(1) depends on the how the jury allocates the various tortfeasors' percentages of fault. See United Servs. Auto. Ass'n v. Phillips, 740 So.2d 1205, 1209 (Fla. 2nd DCA 1999)(explaining that under section 627.727(1) each source of "available" benefits entails a legally enforceable right to recover which arises upon the occurrence resulting in the insured's injury).
However, under section 627.727(6)(c), when a plaintiff settles with an underinsured tortfeasor prior to the jury's verdict, the UM carrier is entitled to a credit against the plaintiff's total damages in the amount of the limits of that underinsured tortfeasor's liability policy, regardless of that tortfeasor's percentage of fault, and regardless of whether the damages are noneconomic in nature. Thus, and as a result of Fabre and Wells, subsection (6)(c) conflicts with subsection (1). In an effort to harmonize these provisions, we must resort to rules of statutory construction in order to ascertain the overall legislative intent behind the statute. See Woodgate Dev. Corp. v. Hamilton Inv. Trust, 351 So.2d 14 (Fla.1977)(holding where possible courts must adopt construction of statutory provisions which harmonizes and reconciles them with other provisions of the same act).
As a general rule of statutory construction, provisions of an act are to be read as consistent with one another rather than in conflict, if there is any reasonable basis for consistency. State v. Putnam County Dev. Auth., 249 So.2d 6 (Fla.1971). When conflicting provisions exist within the same statute the most recent expression contained in the statute normally prevails. Sharer v. Hotel Corp. of Am., 144 So.2d 813 (Fla.1962). Notwithstanding this rule, if the last expression in one section is plainly inconsistent with preceding sections which conform to the legislature's obvious policy and intent, the later section must be construed as to give it effect consistent with such other sections and with policy they indicate. Id. In all, statutes must be construed as to avoid an unreasonable or absurd result. City of Boca Raton v. Gidman, 440 So.2d 1277, 1281 (Fla.1983).
Pursuant to these guidelines, and to avoid an absurd result, we believe that the credit in section 627.727(6)(c) applies only to those damages which could have been recovered from the settling tortfeasor had he or she remained a defendant in the trial. Under this interpretation, because Ms. Buchholz was jointly and severally liable for all the economic damages awarded, her $100,000 policy limits should have been applied to offset the $51,478.90 of such damages awarded. However, we reached a different result with respect to the noneconomic damages awarded. The maximum amount that Mrs. Rush could have recovered from Ms. Buchholz had she not settled with respect to these damages *1033 would have been $1,310.40, or 15% of the total award. In other words, and under section 627.727(1), the total benefits that Mrs. Rush would have had available from Ms. Buchholz's insurance policy was $1,310.40. Since Allstate would not have been able to collect more than $1,310.40 from Ms. Buchholz with respect to these damages had Mrs. Rush not settled, it should not receive a credit as against the remaining 85% of the award.
We believe that this interpretation of the statute comports with both logic and public policy. By adding subsection (6)(c) in 1992, the legislature also intended to protect UM carriers when their insureds tried to settle for less than the underinsured tortfeasor's liability policy limits. As Allstate notes, a plaintiff cannot create a UM claim by settling with an insured tortfeasor for less than the amount of the plaintiff's damages where the tortfeasor's total policy limits could have been used to cover those damages. Wausau Underwriters Ins. Co. v. Taubler, 448 So.2d 545, 545-46 (Fla. 5th DCA 1984). Although they may not have intended to do so, the Rushes effectively created a UM claim with respect to Mrs. Rush's noneconomic damages by settling as they did.
Accordingly, we reverse the award in part. Allstate, under Mrs. Rush's policy, was obligated to pay Mrs. Rush the remaining $7,425.60 of her noneconomic damages on behalf of the two remaining uninsured tortfeasors. As to the other points presented on appeal, based on the specific arguments, we affirm.
AFFIRMED in part; REVERSED in part and REMANDED.
WARNER, C.J., STONE, J., and GLICKSTEIN, HUGH S., Senior Judge, concur.
NOTES
[1] The Rushes' UM policy is not of record in this appeal.
[2] While Allstate had advised the Rushes to settle with Ms. Buchholz, it did not attend the mediation at which settlement occurred and, thus, did not authorize the actual settlement that occurred.
[3] For reasons not explained in the record, the final judgment omitted Mr. Aiello's liability as a tortfeasor.
[4] The 1992 amendment to section 627.727(6) provided,

(6)(a) If an injured person or, in the case of death, the personal representative agrees to settle a claim with a liability insurer and its insured, and such settlement would not fully satisfy the claim for personal injuries or wrongful death so as to create an underinsured motorist claim, then written notice of the proposed settlement must be submitted by certified or registered mail to all underinsured motorist insurers that provide coverage. The underinsured motorist insurer then has a period of 30 days after receipt thereof to consider authorization of the settlement or retention of subrogation rights. If an underinsured motorist insurer authorizes settlement or fails to respond as required by paragraph (b) to the settlement request within the 30 day period, the injured party may proceed to execute a full release in favor of the underinsured motorist's liability insurer and its insured and finalize the proposed settlement without prejudice to any underinsured motorist claim.
(b) If an underinsured motorist insurer chooses to preserve its subrogation rights by refusing permission to settle, the underinsured motorist insurer must, within 30 days after receipt of the notice of the proposed settlement, pay to the injured party the amount of the written offer from the underinsured motorist's liability insurer. Thereafter, upon final resolution of the underinsured motorist claim, the underinsured motorist insurer is entitled to seek subrogation against the underinsured motorist and the liability insurer for the amounts paid to the injured party.
(c) The underinsured motorist insurer is entitled to a credit against total damages in the amount of the limits of the underinsured motorist's liability policy in all cases to which this subsection applies, even if the settlement with the underinsured motorist under paragraph (a) or the payment by the underinsured motorist insurer under paragraph (b) is for less than the underinsured motorist's full liability policy limits. The term "total damages" as used in this section means the full amount of damages determined to have been sustained by the injured party, regardless of the amount of underinsured motorist coverage. Nothing in this subsection, including any payment or credit under this subsection, reduces or affects the total amount of underinsured motorist coverage available to the injured party.
Ch. 92-318, § 79, Laws of Fla.