816 So.2d 1125 (2002)
Linda MEEKS, Personal Representative of the ESTATE OF Herbert J. MEEKS, Deceased, Appellant,
v.
FLORIDA POWER & LIGHT COMPANY, a Florida Corporation, and BellSouth Telecommunications, Inc., Appellees.
No. 5D01-1805.
District Court of Appeal of Florida, Fifth District.
March 22, 2002.
*1126 Robert P. Avolio and Tracy L. Markham of Avolio & Hanlon, P.C., St. Augustine, for Appellant.
John R. Hargrove and Robert C. Weill of Heinrich, Gordon, Hargrove, Weihe & James, P.A., Fort Lauderdale, for Appellees BellSouth Communications, Inc.
No Appearance for Appellees Florida Power & Light Company, a Florida Corporation.
SAWAYA, J.
Linda Meeks, the personal representative of the estate of her deceased husband, Herbert Meeks, appeals the summary final judgment entered in favor of BellSouth Telecommunications, Inc. (BellSouth) in the wrongful death action she filed after Mr. Meeks was electrocuted by downed Florida Power and Light (FPL) electric wires suspended from a rotted-out pole allegedly owned by BellSouth.[1] She argues, inter alia, that (1) the trial court erred in holding that BellSouth owed no duty to Mr. Meeks where there are questions of fact regarding the existence of a *1127 bailment of the pole to FPL and (2) the trial court erred in restricting the surviving minor child's recovery to only those years before he reached the age of 25. We agree.

Factual Background
On December 15, 1997, Mr. Meeks left his home situated on Poa Boy Farms Road to deliver a food platter to his daughter. Not far from his home, his path was blocked by a downed pole with live wires attached to it. The wires held the pole suspended about three feet above the road; the wires themselves drooped to within a foot of the ground. Mr. Meeks stopped his truck 50 to 100 yards from the pole. From his footprints, it was determined that Mr. Meeks got out of his truck and walked to within ten feet of the pole, at which point he was electrocuted. Mr. Meeks was pronounced dead at the scene. He is survived by his wife and by two children from a prior marriagea daughter who was 28 years old at the time of the accident and a son who had just turned 24.
The parties stipulated that the pole fell across the road because the base of the pole had rotted. They do not agree, however, who was responsible for maintaining and inspecting the pole.
The pole was installed in 1952 by BellSouth's predecessor. As of the date of the 1997 accident, the pole was still tagged with a metal BellSouth tag as pole number 5 and was identified on BellSouth plats as a BellSouth pole. BellSouth claims, however, to have abandoned the pole in 1973 or 1974 by removing its wires from it and all the other poles in that pole line. After BellSouth removed its wires, BellSouth had nothing further to do with the poles; only FPL had wires running on the subject pole line.
FPL's use of BellSouth's poles is governed by their Joint Use Agreement (JUA), a detailed contract covering all aspects of the joint use of poles.[2] Under the JUA, each company has the right to use the other's poles. The JUA states that the owner of the pole "shall, at its own expense, maintain its joint poles in a safe and serviceable condition." Article IX of the JUA, entitled "Abandonment of Jointly Used Poles," provides that if the owner of a jointly-used pole wants to abandon any jointly-used pole, "it shall give [joint user] notice in writing to that effect at least sixty (60) days prior to that date on which it intends to abandon such pole." The JUA states that if, at the expiration of the sixty-day period, the joint user has attachments to the pole but owner does not, then the pole
thereupon becomes the property of the joint user and the joint user (a) shall indemnify and save harmless [the original owner] from all obligation, liability, damages, cost, expenses or charges incurred thereafter and arising out of the presence or condition of such pole or any attachments thereon, whether or not such liability is due to or caused by, in whole or in part, the negligence of [the original owner]; and (b) shall pay [the original owner] a sum equal to the then value in place of such abandoned pole....
FPL pays BellSouth to use poles not owned by it; the same is true of BellSouth.
When BellSouth removed its wires from the pole line, BellSouth did not notify FPL that it was abandoning the poles, contrary to the requirements of the JUA for abandonment. The written notice is important to FPL because without it, FPL would *1128 have no way of knowing whether it was required to assume maintenance of the pole. Neither company has a routine pole inspection program; thus, unless work has to be done on a wire, an individual pole is not visited. FPL does not assume that just because BellSouth has removed its wires, BellSouth has abandoned a pole as FPL has no way of knowing what BellSouth's future intent would be for the pole.
The trial court granted summary judgment in favor of BellSouth. The trial court ruled that even though BellSouth owned the pole, it did not owe Mr. Meeks a duty of care because a bailment relationship existed between BellSouth and FPL concerning the pole, thereby relieving BellSouth of any liability. The trial court also ruled that any damages that may have been recoverable on behalf of Mr. Meeks' minor son under section 768.21(3), Florida Statutes (1997), are measured up to the time the child reaches the age of 25. We will address first the issue of duty of care.

Duty Of Care
The existence of a legal duty of care owed by the defendant to protect the plaintiff from unreasonable risk of harm is an essential element of a cause of action based on negligence. Stevens v. Jefferson, 436 So.2d 33 (Fla.1983). The extent of that duty of care is dependent on the scope of the anticipated risks to which the defendant exposes others. Id. The Florida Supreme Court recognized long ago that telephone companies know that wooden telephone poles deteriorate over time and that they have a duty to inspect and maintain them in a reasonably safe condition. In Peninsular Telephone Co. v. Dority, 128 Fla. 106, 174 So. 446 (1937), the supreme court specifically held:
The defendant telephone company is held to take notice and have knowledge that wooden telephone line poles with one end in the ground do rot beneath the surface of the ground, and that such decay does not happen suddenly.... [T]herefore it is the duty of the company using such poles for its telephone wires to exercise all ordinary and reasonable care and diligence to maintain the safety of the poles by appropriate and sufficient examination and inspection of the condition of the poles being so used, including the parts of the poles that are below the surface of the ground as well as the portion that is above ground.
Id. at 450[3]; see also Webb v. Glades Elec. Co-op., Inc., 521 So.2d 258, 259 (Fla. 2d DCA 1988) (noting that utilities have a duty to, among other things, exercise care in the maintenance of their poles) (citations omitted). Simply put, a pole owner has a duty to maintain its poles to protect against the reasonably foreseeable harm that can befall the traveling public from rotted-out poles.
In the instant case, in 1952, BellSouth's predecessor installed the pole that fell and caused Mr. Meeks' death. As noted above, when the accident occurred in *1129 1997, the pole had a metal BellSouth tag attached to it which designated it as pole number five. Moreover, the pole was identified on BellSouth's plats as a BellSouth pole. We conclude, as owner of the pole, that BellSouth has a duty to inspect and maintain it in a reasonably safe condition. Moreover, absent a contract providing to the contrary, the fact that other utilities have wires strung on the pole is generally not a basis to relieve the owner of the pole of the duty to maintain it in a reasonable safe condition.
The trial court found, however, that "[w]hile BellSouth may still have owned the utility pole in question, it clearly created a bailment relationship with Florida Power and Light...." In these proceedings, BellSouth argues in support of the application of the law of bailments.[4] Establishing a bailment relationship with FPL is undoubtedly attractive to BellSouth because, as a general rule, when a bailment occurs, the bailor is not liable for injuries to third persons caused by the negligence of the bailee in the use of the bailed property. See Moessinger v. Johnson, 292 So.2d 606 (Fla. 2d DCA 1974). Thus we must next address the issue whether the trial court properly found that a bailment was created between FPL and BellSouth that relieved BellSouth of its duty of care.

Bailment
In S & W Air Vac Systems, Inc. v. Department of Revenue, State of Florida, 697 So.2d 1313 (Fla. 5th DCA 1997), this court generally defined "bailment" as "a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner." Id. at 1315 (citation omitted). As a general rule, delivery of the item to the bailee must give him or her the right to exclusive use and possession of the item for the period of the bailment. S & W; see also Monroe Sys. for Bus., Inc. v. Intertrans Corp., 650 So.2d 72 (Fla. 3d DCA 1994), rev. denied, 659 So.2d 1087 (Fla.1995); 8A Am.Jur.2d Bailments § 42 (1997) (noting, "In order to constitute a sufficient delivery of the subject of a bailment, there must be such a full transfer, actual or constructive, to the bailee as to exclude the possession of the owner and all other persons and give to the bailee, for the time being, sole custody and control thereof.") (footnote omitted).
A bailment, being a contractual relationship, may result from either an express contract or one implied by the law. 8A Am.Jur.2d Bailments § 28 (1997). A contract for bailment generally requires delivery by the bailor and acceptance by the bailee. Id.; see also S & W. In the instant case, it is not clear whether there *1130 was a "delivery" by BellSouth with the intent of giving FPL exclusive use and possession of the pole nor is there evidence that FPL accepted the pole; BellSouth just left the pole with the knowledge that FPL still had wires on it. BellSouth was apparently collecting a licensing fee for the pole and, importantly, under the JUA had the right to reattach to the pole without FPL's permission.
We conclude from our examination of the record in the instant case, that there are material questions of fact as to whether a bailment relationship existed between BellSouth and FPL. See 5 Fla. Jur.2d Bailments § 31 (2000) (stating that whether a bailment has been created is a question of fact for the trier of fact). Therefore, the trial court erred in entering summary judgment in favor of BellSouth on the bailment theory.[5]See Krol v. City of Orlando, 778 So.2d 490 (Fla. 5th DCA 2001).

Damages Under Section 768.21(3)
We are presented with the issue whether Florida's Wrongful Death Act (the Act) limits the recovery of a minor child's claim of lost parental companionship and mental pain and suffering for the wrongful death of a parent to that period of time before the minor reaches the age of 25, which is the period of minority as defined in the Act. The trial court ruled that a minor may not recover this category of damages past the period of minority. We disagree.
This appears to be an issue of first impression in Florida that requires this court to interpret certain provisions of the Act relating to the right of recovery by minors for the wrongful death of a parent. We must undertake this task mindful of the legislative admonition that the Act is "remedial and shall be liberally construed." § 768.17, Fla. Stat. (1997); see also Golf Channel v. Jenkins, 752 So.2d 561, 565-66 (Fla.2000) (observing the principle that remedial statutes should be liberally construed and limitations on remedial statutes should be narrowly construed).
The Act defines "survivors" broadly to include the decedent's children. § 768.18(1), Fla. Stat. (1997). As survivors, children of the decedent may be entitled to recover certain categories of damages under the Act. However, as in the instant case, a child's right of recovery may depend on whether he or she falls within the definition "minor children," which requires the child to be "under 25 years of age, notwithstanding the age of majority." § 768.18(2), Fla. Stat. (1997).
The specific category of damages we are here concerned with is addressed in section 768.21(3), Florida Statutes (1997), which provides:
Minor children of the decedent, and all children of the decedent if there is no surviving spouse, may also recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury.
The statute provides a starting date from which this category of damages begins, but it obviously does not provide an ending date. BellSouth argues that the ending date is the date the child reaches the age of 25. Mrs. Meeks, on the other hand, argues that the age limitation of 25 is merely a qualifying factor which permits a minor child to claim this category of damages *1131 and, once established, allows recovery for the life of the child.
We find the argument presented by Mrs. Meeks the more persuasive. Although this issue has not been resolved by the appellate courts, one court did at least tangentially address it in Stresscon International, Inc. v. Helms, 390 So.2d 139 (Fla. 3d DCA 1980), wherein the court stated.
In addition to the general contention that the verdict is too large, Stresscon argues that the jury should not have been allowed to award damages for pain and suffering to the surviving children computed over the joint life expectancies of the children and their father; it is urged that such damages are statutorily allowable if computed over the children's period of minority only. See § 768.21(3), Fla. Stat. (1977). Our reading of the statutory language does not support that view; in any event, we stop short of full-blown analysis thereof because the record does not disclose a timely objection below upon which to hinge Stresscon's claim.
Id. at 141. Although this language is dictum and, therefore, not binding precedent, we find the view of the Third District congruous with our independent analysis.
We also find instructive the standard jury instructions promulgated by the Florida Supreme Court. Standard Jury Instruction 6.6(g) provides:
The loss by (name all eligible children) of parental companionship, instruction and guidance, and [his][her] [their] mental pain and suffering as a result of the decedent's injury and death. In determining the duration of such losses, you may consider the [joint life expectancy of the decedent and [the surviving child] [each of the surviving children]] [life expectancy of [the surviving child] [each of the surviving children]] together with the other evidence in the case.
Fla. Std. Jury Instr. (Civ.) 6.6(g). The committee notes state that "the Committee revised 6.6g in 1987 to recognize that `joint life expectancy' is not prescribed by § 768.21(3), F.S., as the only measure of a child's future loss" and that "[t]he evidence may support a finding of a longer or a shorter duration." Certainly, while not binding precedent, the Florida Supreme Court, in adopting this jury instruction, and the court in Helms indicated a preference for the view that a minor child's recovery under section 768.21(3) is not limited by the period of minority and may extend over the life expectancy of the child. So do we.
More importantly, however, in resolving the issue before us, it is the intent of the Legislature which is "the polestar that guides us in our inquiry." Donato v. American Tel. & Tel. Co., 767 So.2d 1146, 1150 (Fla.2000); see also Deason v. Florida Dep't of Corrections, 705 So.2d 1374 (Fla.1998); Racetrac Petroleum, Inc. v. Delco Oil, Inc., 721 So.2d 376 (Fla. 5th DCA 1998). Our search for the legislative intent embodied in this statute and the interpretation we ultimately give it must be dictated by established canons of statutory construction. One such rule requires that sections of a statute be considered together and interpreted in such a way as to bring them in harmony with one another.[6] Another requires that we interpret *1132 this statute in order to avoid an unreasonable or absurd result.[7] Thus in our search for the legislative intent and in keeping with these general rules of statutory construction, we will examine the other subsections of section 768.21 that have provisions similar to subsection (3).
We begin our analysis with the integral provisions of subsection (3). We note that section 768.21(3) allows recovery by adult childrenage 25 and overof lost parental companionship and mental anguish, provided the decedent was the last surviving spouse. To adopt the view espoused by BellSouth would require that a minor child's claim be limited to the period of minority while an adult child would be entitled to recover for the period of his or her life. For example, an only child who is 24 years old would be allowed a recovery period of one year, but an only child who is an adult child would be allowed a recovery period for life.[8] Moreover, if there are several children, and some are minors and some are adults, under BellSouth's view, the minors would be allowed recovery until the age of 25, but the adults would be allowed recovery for life. Clearly, the interpretation espoused by BellSouth would lead to absurd results in certain instances and would create an anomaly in the law that the Legislature did not intend by requiring disparate treatment of minor and adult children. This we must avoid. See Rush; Pavolini.
We also find persuasive the interpretation the courts have given subsection (4) which provides in pertinent part that "[e]ach parent of a deceased minor child may also recover for mental pain and suffering from the date of injury." § 768.21(4), Fla. Stat. (1997) (emphasis supplied). In Gross Builders, Inc. v. Powell, 441 So.2d 1142 (Fla. 2d DCA 1983), the court specifically rejected the argument that the parents' claim for mental pain and suffering was limited to the period of the deceased minor child's minority. Recognizing that the mental pain and suffering of the parents could continue through their lifetimes, the court held that "in determining the amount of an award to parents of a deceased minor child for mental pain and suffering, the jury may consider the joint life expectancies of the child and the parents." Id. at 1144. See Roberts v. Holloway, 581 So.2d 619 (Fla. 4th DCA 1991). We believe that a minor child suffers and grieves no less for the loss of a mother or father and, therefore, should be treated no differently than an adult child or spouse.
*1133 Additionally, section 768.21(2) similarly provides that "[t]he surviving spouse may also recover for loss of the decedent's companionship and protection and for mental pain and suffering from the date of injury." Obviously, the measure of damages under this section is not limited by any time periods such as minority. Our analysis of all of the provisions of section 768.21 leads us to only one logical conclusion, which is that a minor child's recovery should be measured by the joint life expectancy of the child and the deceased parent. This interpretation brings symmetry to all of the provisions of the statute.
Moreover, with respect to purely economic damages including support and services, section 768.21(1) specifically provides that the period of minority of a healthy minor child is a relevant factor to be considered by the trier of fact in determining the amount of damages, but it is only one of several factors. If the Legislature intended that a minor child's claim for lost parental consortium, after it vested, would end at a particular point, it could have easily inserted a limiting period in section 768.21(3), as it did in section 768.21(1). Since it did not, the obvious intent of the Legislature is that no such limitations period should be applied to section 768.21(3) claims.
We find nothing in the record or in the law to indicate that the broken heart of a minor child caused by the grievous loss of a parent heals any faster than the broken heart of an adult child, or of a spouse who mourns the loss of a husband or wife. Moreover, we find no basis in the provisions of section 768.21(3) that requires disparate treatment of minor children, adult children, or spouses who seek damages for mental pain and suffering for the loss of a loved one. We conclude, therefore, that damages recovered by a minor child pursuant to section 768.21(3) should be calculated based on the joint life expectancy of both the deceased parent and the child. Thus in the instant case, unobstructed by age limitations, the jury will have the ability to view through the prism of their life experiences the full measure of recompense due a son for the loss of his father.
We certify to the Florida Supreme Court the following question as one of great public importance:
ARE THE DAMAGES RECOVERABLE BY A MINOR CHILD PURSUANT TO SECTION 768.21(3), FLORIDA STATUTES, LIMITED TO THE PERIOD OF MINORITY?
REVERSED and REMANDED for further proceedings; QUESTION CERTIFIED.
THOMPSON, C.J., and PALMER, J., concur.
NOTES
[1] Although originally named as a defendant along with BellSouth, FPL settled and was dismissed from the suit.
[2] "Joint use pole" is defined by the JUA as "a pole upon which space is provided under this Agreement for the attachments of both parties, whether such space is actually occupied by attachments or reserved therefor upon specific request."
[3] Dority involved an employee of the telephone company who worked as a lineman on its poles. He was injured while working on a pole that, because of decay and rot at its base, fell while he was on it. He brought an action pursuant to Florida's Hazardous Occupation Act found in chapter 769, Florida Statutes. We cite Dority for the proposition that it is reasonably foreseeable to a telephone company that its wooden poles rot after time and may pose a danger when they fall. The Hazardous Occupation Act does not alter the duty of care owed by a telephone company to keep its poles in a reasonably safe condition. See Hamilton v. Armstrong Cork Co., 371 F.2d 139 (5th Cir.1967). In Hamilton, the court specifically discussed the decision in Dority and stated that "[w]hile the Act eliminates certain defenses and effects other changes not here pertinent, it does not change the duty of ordinary and reasonable care." Id. at 141.
[4] BellSouth initially argued that it abandoned the pole and that "[b]y operation of law, the abandonment created a `bailment' of the poles, with FP & L assuming the legal status of `bailee.'" However, it wisely conceded at oral argument that this position was ill-conceived. By definition, the two concepts cannot co-exist. See Kitchen v. Wachovia Bank & Trust Co., N.A., 44 N.C.App. 332, 260 S.E.2d 772, 774 (1979) ("Defendant's attempt to create a gratuitous bailment out of an alleged abandonment by plaintiff is somewhat of a non sequitur. It is correct that personal property may be abandoned. But as a result of abandonment, ownership of personalty is lost; the former owner of the property is divested of title to the property.") (citation omitted). Abandonment is a relinquishment of the owner's legal right to a thing and the question of whether something was abandoned raises a question of fact for the jury. 1 Am.Jur.2d Abandoned, Lost, and Unclaimed Property § 41 (1994). Bailment, on the other hand, requires an owner of the object (the bailor) and the possessor (the bailee). BellSouth, although discarding its original abandonment-to-bailment theory, maintains that bailment was correctly applied in this case.
[5] The parties have not raised the issue whether bailment is limited to items of personalty and, if so, whether a telephone pole constitutes personalty or a fixture to realty. This is not an easy determination. Sweeting v. Hammons, 521 So.2d 226, 228 (Fla. 3d DCA 1988) (observing, "Whether or not a chattel when attached to real estate becomes a fixture and thus part of the realty is a complex problem."). Since the parties have not raised the issue in these proceedings, we need not decide it here.
[6] See Rollins v. Pizzarelli, 761 So.2d 294, 298 (Fla.2000) (cautioning that "statutes must be read together to ascertain their meaning"); Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992) (stating, "Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another."); Allstate Ins. Co. v. Rush, 777 So.2d 1027,1032 (Fla. 4th DCA 2000) (noting that "provisions of an act are to be read as consistent with one another"), rev. dismissed, 790 So.2d 1101 (Fla.2001); WFTV, Inc. v. Wilken, 675 So.2d 674 (Fla. 4th DCA 1996) (holding that in determining the legislative intent of a specific subsection, other subsections of a statute may be considered).
[7] See Rush, 777 So.2d at 1032 (stating that "statutes must be construed as to avoid an unreasonable or absurd result") (citing City of Boca Raton v. Gidman, 440 So.2d 1277, 1281 (Fla.1983)); Pavolini v. Bird, 769 So.2d 410 (Fla. 5th DCA 2000), rev. denied, 790 So.2d 1102 (Fla.2001).
[8] We recognize the perceived unfairness of establishing an age limitation that prohibits an adult from recovering under section 768.21(3) when there is a surviving spouse, but allows a minor the right of recovery. However, the Legislature in doing so did not eliminate an existing remedy but simply created a limited grant to adult children of the right to recover damages where no right had previously existed at all. See Stewart v. Price, 718 So.2d 205 (Fla. 1st DCA 1998) (upholding constitutionality of statute precluding adult children from recovering damages for mental pain and suffering in medical malpractice action), approved, 762 So.2d 475 (Fla.2000). Here we are not concerned with the prohibition of a right to recover; rather, we are concerned with a limitation on the amount that may be recovered once a right of recovery has been established under the statute.