774 So.2d 763 (2000)
Charles DIXON, Jr., Charles Dixon, III, and Dixie Landing Homeowners Association, Appellants,
v.
The CITY OF JACKSONVILLE, a consolidated municipal corporation; the City Council of the City of Jacksonville; Estuary Corp., a Florida corporation; and Steinemann and Company, Appellees.
No. 1D99-2171.
District Court of Appeal of Florida, First District.
November 28, 2000.
Rehearing Denied December 29, 2000.
*764 Paul M. Harden, Jacksonville, for Appellants.
Richard A. Mullaney, General Counsel, Tracey I. Arpen, Jr., Deputy General Counsel, and Karl J. Sanders, Assistant General Counsel, for Appellees the City of Jacksonville and the City Council of the City of Jacksonville.
W.O. Birchfield and Lynda R. Aycock of Martin, Ade, Birchfield & Mickler, P.A., Jacksonville, for Appellees Estuary Corp. and Steinemann and Company.
ERVIN, J.
This is an appeal from a final order denying appellants' motion for a temporary and/or permanent injunction to enjoin the implementation of an ordinance (a development order) adopted by appellee, City of Jacksonville, which would rezone certain real property adjoining the residences of appellants, Charles Dixon, Jr., and Charles Dixon, III, from its classification of "Commercial Office" to "Planned Urban Development" (PUD), thereby permitting the construction of a hotel on the site. We reverse as to the first issue raised, which contends that the circuit court erred in its interpretation of the City's 2010 Comprehensive Plan, by deciding that a hotel is an appropriate land use within an area labeled as Residential/Professional/Institutional (RPI), and is consistent with the plan's functional land-use designation. Our disposition of this issue moots consideration of the remainder.
It is well established that a development order shall be consistent with the governmental body's objectives, policies, land uses, etc., as provided in its comprehensive plan. See § 163.3194(3)(a), Fla. Stat. (1999). Appellants claimed that the development order was inconsistent with the comprehensive plan and sought injunctive relief pursuant to section 163.3215(1), Florida Statutes (1999). A preliminary question that must be answered before we address the merits is what standard of review should be applied to the trial court's order denying appellants' motion. We cannot agree with the City's argument that the standard is only one of determining whether there was competent and substantial evidence, which is far more deferential than that which we apply infra. Because the approach followed by both the City and trial court in deciding whether the PUD was consistent with the plan involved little more than a comparison of the development order with the plan, we adhere to the test this court announced in B.B. McCormick & Sons, Inc. v. City of Jacksonville, 559 So.2d 252, 255 (Fla. 1st DCA 1990). In that case, we disapproved a standard more deferential than strict scrutiny in cases where the issue is "relatively easily subject to examination for strict compliance with the plan," and we approved the following analysis set forth in Machado v. Musgrove, 519 So.2d 629, 632 (Fla. 3d DCA 1987) (citations omitted):
The test in reviewing a challenge to a zoning action on grounds that a proposed project is inconsistent with the comprehensive land use plan is whether the zoning authority's determination that a proposed development conforms to each element and the objectives of the land use plan is supported by competent and substantial evidence. The traditional and non-deferential standard of strict judicial scrutiny applies.
Strict scrutiny is not defined in the land use cases which use the phrase but its meaning can be ascertained from the common definition of the separate words. Strict implies rigid exactness or precision. A thing scrutinized has been subjected to minute investigation. Strict scrutiny is thus the process whereby a court makes a detailed examination of a statute, rule or order of a tribunal for exact compliance with, or *765 adherence to, a standard or norm. It is the antithesis of a deferential review.
Because we conclude that the issue before us is one that is "easily subject to examination for strict compliance with the plan," we apply the standard of strict scrutiny to resolve it, a process which involves a detailed examination of the development order for exact compliance with, or adherence to, the comprehensive plan. We reject, moreover, the City's argument that deference should be given to the City's interpretation of a law which it administers, thereby requiring its approval so long as its construction falls within the range of possible interpretations. We are instead presented with a question which is purely one of law, and we are not constrained by more deferential standards from substituting our judgment for that of the lower tribunal.
It is well established that the construction of statutes, ordinances, contracts, or other written instruments is a question of law that is reviewable de novo, unless their meaning is ambiguous. See, e.g., City of Homestead v. Levy, 444 So.2d 1074 (Fla. 3d DCA 1984) (appellate court disagreed with trial court's construction of city ordinance, and, concluding there was no ambiguity therein, reversed injunction entered by trial court); Union Camp Corp. v. Seminole Forest Water Management Dist., 302 So.2d 419 (Fla. 1st DCA 1974) (this court disagreed with trial court's construction of statutory language, concluding that various phrases therein that trial court misinterpreted were clear and unambiguous); Winter v. Play a del Sol, Inc., 353 So.2d 598 (Fla. 4th DCA 1977) (trial court erred in construing statute in a manner that would lead to an absurd result). These decisions show that even if the meaning of a statute or a writing is complicated, this does not necessarily render it "ambiguous."
We are not of the view that the City's 2010 Comprehensive Plan is ambiguous, thereby making it susceptible to different interpretations. Indeed, ambiguity in such plans would frustrate one of the cardinal purposes behind their creation: to provide "materials in such descriptive form ... as may be appropriate to the prescription of principles, guidelines, and standards for the orderly and balanced future ... development of the area." § 163.3177(1), Fla. Stat. (1999) (emphasis added). Moreover, the flexible interpretation urged by the City thwarts a primary objective within the plan itself: "to insure protection of existing and emerging residential areas from encroachment by intrusive commercial, industrial and public/semi-public uses." Indeed, were we to adopt the deferential standard applied to the plan by the lower court, the ultimate determination of a planned development would be placed within the discretion of whoever composes the membership of the governmental body's planning department at any given time, and the goal of certainty and order in future land-use decision-making would be circumvented.
In applying the criterion of strict scrutiny to our review, we agree that the lower court erred in concluding there is no inconsistency between the development order and the plan. The plan sets forth ten major categories of land use. This case centers on the court's interpretation of language in one of the ten, the "Commercial" category, which includes the following five subcategories: Residential/Professional/Institutional (RPI), Neighborhood Commercial (NC), Community/General Commercial (C/GC), Regional Commercial (RC), and Central Business District (CBD). Each subcategory in turn lists primary and secondary uses; the latter being uses which support the various primary uses. The applicable subcategory at issue is that of RPI. Nowhere is the use of a hotel mentioned within the RPI classification, either specifically, or by reasonable implication. In fact, in all of the five listed subcategories, the primary use of a hotel is *766 explicitly referred to only in the C/GC[1] designation.
The RPI subcategory sets out a number of primary uses within it. They include
office, limited commercial retail and service establishments, institutional and medium density residential uses. Large scale institutional uses, which require supporting residential and office components, are also permitted; as are office-professional uses as well as mixed use development[.]
Obviously, none of the above primary uses reasonably suggests the use of a hotel. Besides listing numerous primary uses within the RPI, the subcategory also refers to secondary uses in the following manner: "In addition to the secondary and supporting uses for all commercial land use categories listed heretofore, ... [the passage thereafter provides a number of secondary examples, none of which includes hotel] and related uses may also be permitted when sited in compliance with this and other elements of the 2010 comprehensive plan and all applicable Land Development Regulations." The above language relating to secondary uses "for all commercial land use categories listed heretofore" could not encompass a hotel as a primary use within the RPI description because, as stated, none of the primary uses refers to or implies that of a hotel.
The other provision within the RPI description, cited by both the trial court and the City as authorizing the PUD, states, "The mix of land uses included in this category is flexible and consists of ... up to 50 percent commercial and service establishments." The lower court and the City interpreted this language to permit the PUD, because it provides for less than 50 percent commercial use. This conclusion is erroneous. It is obvious from a plain reading of the above passage that the commercial portion of the mix permits only commercial uses otherwise allowable in the RPI, which, as stated, neither expressly nor by reasonable implication allows hotels.
We therefore conclude, from our examination of the various uses within the RPI subcategory, both primary and secondary, that the planned development of a hotel cannot qualify as any type of permissible use. Accordingly, the traditional maxim of construction, expressio unius est exclusio alterius, appears altogether applicable.
If the interpretation approved by the trial court is to survive the test of strict scrutiny, its validity must be supported by other provisions of the plan outside the RPI subcategory. As previously stated, RPI referred to secondary uses "for all commercial land use categories listed heretofore." It appears from our examination that the court based its conclusion permitting the use of a hotel within an RPI designation on provisions of the plan preceding those which describe the RPI.
The first sentence of the overall Commercial category provides that the category encompasses "all types of sales and service activities, such as retail trade, personal and professional services and storage, offices, hotels, motels, entertainment, and amusement facilities. Commercial recreation and entertainment activities, such as amusement parks and marinas, are also allowed in this category," as are certain residential and light industrial uses (emphasis added).
In reaching its conclusion, which the lower court approved, that the RPI subcategory allows the secondary and supporting uses for all commercial land use categories, including that of hotel, the City ostensibly relied on the general language contained in the above first quoted sentence within the Commercial use description, *767 as well as on certain prefatory language to the various plan category descriptions, particularly the statement that "[e]ach category has a range of potentially permissible uses, which are not exhaustive, but are intended to be illustrative of the character of the uses permitted." If the above general language was the springboard on which the City used to base its rezoning ordinance, it apparently ignored or overlooked the statements following it, which cautioned, "Not all potential uses are routinely acceptable anywhere within the land use category," as well as the language immediately thereafter, saying that a potential use must be evaluated for compliance with the goals, objectives and policies of the plan.
The City, relying on the above cited general language which broadly permitted the use of hotels within the overall Commercial category, of which an RPI is a subcategory, concluded that because hotels were not specifically excluded by the RPI, but were, in fact, explicitly permitted under the C/GC classification, the RPI subcategory therefore allowed all secondary and supporting uses, including that of hotel. We cannot agree. The City apparently ignored the fact that hotels are not listed within the C/GC description as a secondary or supporting use, but only as a primary use. Additionally, the City's reference to the C/GC subcategory, which followed that of RPI, glossed over the "heretofore" language in the RPI phrase. It is possible that the City's reference to hotels pertained to the term's previous mention in the introductory language to the initial Commercial category. A plain reading of this textual material shows, however, that the examples there cited, including "hotel," are primary uses which would thereafter specifically appear in later designated subcategories, as the term expressly does under that of C/GC.
There is, moreover, no language provided under the Commercial designation which reasonably supports the secondary use of a hotel within the later listed RPI subcategory. Indeed, the only other passage that the RPI's reference to secondary commercial land use categories "listed heretofore" could conceivably encompass is that earlier provided in the Commercial category, providing: "Secondary uses allowed in the residential categories are also allowed in all commercial categories" (emphasis added). The secondary use of a hotel is, of course, nowhere permitted by the plan in any residential category.
The order denying appellants' motion for a temporary and/or permanent injunction is reversed and the cause is remanded with directions that the City be enjoined from implementing the municipal ordinance at issue.
REVERSED and REMANDED.
LAWRENCE and PADOVANO, JJ., CONCUR.
NOTES
[1] Although the word "hotel" is not specifically listed in the RC subcategory, its use is no doubt allowed therein because it permits all primary uses from the NC and C/GC subcategories. Additionally, such use would appear to be authorized within the CBD subclassification in that it permits therein medium and high-density uses from all of the major land-use categories. No similar language is found, however, in the RPI designation.