864 So.2d 534 (2004)
In re GUARDIANSHIP OF J.D.S.
Jennifer Wixtrom, Appellant,
v.
Department of Children and Families, Appellee.
No. 5D03-1921.
District Court of Appeal of Florida, Fifth District.
January 9, 2004.
*535 Edward P. Jordan, II, of Edward P. Jordan, II, P.A., Clermont, for Appellant.
Rod Taylor of Rod Taylor, P.A., Gotha, for J.D.S.
Charles J. Crist, Jr., Attorney General, George Waas, Senior Attorney General, and Lynn C. Hearn, Deputy Solicitor General, Tallahassee, for the State of Florida.
Randall C. Marshall for American Civil Liberties Union of Florida, Miami, Amicus Curiae.
Bebe J. Anderson for Center of Reproductive Rights, New York, Amicus Curiae.
Julie Sternberg, Diana Kasdan and Jaya Ramji for ACLU Reproductive Freedom Project, New York, Amicus Curiae.
Susan A. England for Florida NOW, Inc., Fern Park, Amicus Curiae.
Mathew D. Staver, Erik W. Stanley and Anita L. Staver for Right To Life, Inc., Longwood, Amicus Curiae.
Laura L. Whiteside, for Advocacy Center for Persons with Disabilities, Inc., Tampa, Amicus Curiae.
Susan Frietsche and David S. Cohen, for Women's Law Project, Pittsburgh, PA, Amicus Curiae.
THOMPSON, J.

INTRODUCTION
Jennifer Wixtrom appeals an order denying her petition to be appointed guardian of the fetus of J.D.S., an incapacitated female.[1] We conclude that the trial court correctly denied the petition and affirm.

*536 FACTS AND PROCEDURAL HISTORY
On 6 May 2003, pursuant to section 415.1051(2), Florida Statutes, the Department of Children and Family Services ("Department") filed a petition seeking an order authorizing emergency adult protective services for J.D.S. In its petition, the Department alleged that J.D.S. was in need of temporary emergency protective services because it had received a report that J.D.S. was pregnant as a result of a sexual battery, which occurred while she was residing in a group home. The petition stated that J.D.S. was a 22-year old woman suffering from severe mental retardation, cerebral palsy, autism, and seizure disorder and that she was unable to adequately provide for her own care and protection. The petition also stated that J.D.S. was nonverbal, unable to make decisions, and unable to comprehend her own mental, physical, or environmental limitations. The petition alleged that J.D.S. was taking numerous medications, which could be detrimental to the fetus. The petition requested appointment of a guardian for J.D.S. and protective supervision for J.D.S. On 13 May 2003, the Department filed an amended petition seeking appointment of a guardian for J.D.S. and a separate guardian for the fetus. The Department alleged that J.D.S.'s interests and needs were potentially adverse to those of the fetus. The Department stated that J.D.S.'s guardian was required to avoid conflicts of interest, but that a conflict of interest was likely because J.D.S.'s medications could be detrimental to the fetus.
On 14 May 2003, the trial court ordered protective services for J.D.S. because she was a vulnerable adult who had been abused. On the same day, Emelia Belford, a professional guardian, instituted a separate proceeding under Chapter 744, which governs guardianships. Belford petitioned the court to determine whether J.D.S. was incapacitated and petitioned to be appointed plenary guardian of J.D.S. Responding to Belford's petition, the trial court appointed an attorney for J.D.S. and appointed a committee to determine if J.D.S. was incapacitated. Belford also filed a petition to be appointed emergency temporary guardian for J.D.S., but the court denied Belford's petition stating that J.D.S. was not then in danger.
Upon entry of the order denying Belford's petition to be appointed temporary guardian of J.D.S., Jennifer Wixtrom filed a petition to be appointed guardian of J.D.S.'s fetus. Wixtrom alleged that the appointment was essential because J.D.S. lacked the mental capacity to provide proper prenatal care and to make necessary decisions for the protection and enhancement of the fetus during its formative months. Citing In re T.W., 551 So.2d 1186, 1190 (Fla.1989), the trial court ruled that it is error to appoint a guardian ad litem for a fetus. The trial court also cited several cases[2] which held that a fetus is not a "person" within the meaning of certain statutes. Furthermore, the court noted that Chapter 744, Florida Statutes, does not provide for the appointment of a guardian for a fetus. Finally, the court denied the petition because Wixtrom neglected *537 to provide her home address on her guardianship application and because she did not certify notice to all parties.
On 2 June 2003, Wixtrom filed a motion for rehearing with a corrected certificate of service. On the same day, the trial court heard testimony regarding J.D.S.'s capacity. The trial court found that J.D.S. was totally incapacitated[3] and ordered the appointment of a plenary guardian for J.D.S. The trial court denied a motion to intervene filed by the Department and the Attorney General.[4] After Wixtrom's motion for rehearing was denied, Wixtrom filed a notice of appeal. Thereafter, the trial court entered an order stating that J.D.S.'s guardian had created a plan for J.D.S. which stated that an abortion would not be performed on J.D.S.

JURISDICTION
In her petition seeking appointment as guardian, Wixtrom alleged that J.D.S.'s guardian owed a fiduciary duty to J.D.S. and that in fulfilling that duty, the guardian might elect to have the fetus aborted or fail to consider that several medications being taken by J.D.S. would have an adverse effect on the fetus. After oral argument, this court was informed that J.D.S. delivered a child.[5] We have elected to decide this case on the merits, notwithstanding its mootness, because we consider this issue to be of great public importance and capable of recurring. Enterprise Leasing Co. v. Jones, 789 So.2d 964 (Fla.2001); In re T.W.; Holly v. Auld, 450 So.2d 217 (Fla.1984); In re Fey, 624 So.2d 770 (Fla. 4th DCA 1993).

STANDARD OF REVIEW
The issue before this court is whether the trial court had the authority to appoint a fetal guardian pursuant to Florida's guardianship statutes. Because this case involves the application of statutory law, and is a pure question of law, the standard of review is de novo. Walter v. Walter, 464 So.2d 538, 539-540 (Fla. 1985); First Union Nat'l Bank v. Turney, 839 So.2d 774 (Fla. 1st DCA 2003); Dixon v. City of Jacksonville, 774 So.2d 763, 765 (Fla. 1st DCA 2000).

*538 ANALYSIS
On its face, Chapter 744, which governs guardianships, does not provide for the appointment of a guardian for a fetus. Section 744.102, the definitions section of Chapter 744, defines the terms, "guardian,"[6] "ward,"[7] and other terms used within the chapter, but it does not define or use the term, "fetus." Furthermore, the term, "fetus" is not used in Chapter 744, and no section of Chapter 744 entitles a fetus or unborn child to a guardian. "[W]hen the language of thestatute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." Holly, 450 So.2d at 219 (Fla.1984) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)). We conclude that the absence of a provision for fetuses means that the protection of the statute does not extend to fetuses. Compare State v. Gonzalez, 467 So.2d 723, 726 (Fla. 3d DCA 1985) (stating that the Florida legislature is capable of distinguishing between an unborn child and a person born alive since it has enacted legislation acknowledging the distinction). The legislature has, in other contexts, explicitly provided protection for fetuses. See, e.g., § 782.071, Fla. Stat. ("`vehicular homicide' is the killing of a human being, or the killing of a viable fetus" by operation of a motor vehicle); § 782.09, Fla. Stat. (willful killing of an unborn child by injury to mother shall be deemed manslaughter). Had the legislature decided that a fetus was entitled to the protection of the guardianship statutes, it would have so legislated. See Davis v. Simpson, 313 So.2d 796 (Fla. 1st DCA 1975) (holding that "person" under wrongful death statute does not include fullterm, viable, but stillborn fetus and stating that changing the statute to include an unborn fetus would require legislative action rather than judicial legislation). Finding no mention of the term, "fetus" in Chapter 744 and no Florida case interpreting the chapter to include fetuses, we conclude that the provisions of Chapter 744 do not apply to a fetus.
Furthermore, section 744.102(8), Florida Statutes, defines a "guardian" as "a person who has been appointed by the court to act on behalf of a ward's person or property or both." A "`ward' means a person for whom a guardian has been appointed." § 744.102(19), Fla. Stat. (emphasis added). It follows that a fetus must be considered a "person" to be appointed a guardian. We find no Florida statute or case law that has determined a fetus to be a person. Rather, the opposite is true. For instance, the Florida Supreme Court declined to rule that a fetus is a "person" within the meaning of the Florida Wrongful Death Act,[8]Young v. St. Vincent's Medical Center, Inc., 673 So.2d 482, 483 (Fla.1996), and the Fourth District declined to apply a child abuse statute[9] in a case involving a fetus, State v. Gethers, 585 So.2d 1140 (Fla. 4th DCA 1991). See also Roe v. Wade, 410 U.S. 113, 158, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ("the word `person,' as used in the Fourteenth Amendment, does not include the unborn"). Also persuasive are holdings from other jurisdictions which have concluded that a fetus is not a "person" and not subject to guardianship. See Matter of D.K., 204 N.J.Super. 205, 497 A.2d 1298, 1302 (Ch. Div.1985) (holding that appointment of guardian for a fetus *539 prior to viability was improper and pointing out that there is no reference to fetuses in guardianship rules and that the use of the term "person" in the rules was significant because a fetus is not a person); see also Roe v. Casey, 464 F.Supp. 483, 487 (D.C.Pa.1978) ("[W]e hold that unborn children (fetuses, embryos) are not persons with a legally protectable interest within the meaning of [Federal Rules of Civil Procedure] and, thus, appointment of guardian [a]d litem is neither warranted nor required"); In re Fetus Brown, 294 Ill.App.3d 159, 228 Ill.Dec. 525, 689 N.E.2d 397 (1997) (holding trial court erred in appointing guardian for fetus in case involving mother's right to refuse medical treatment versus state's interest in the viable fetus). But see 66 Federal Credit Union v. Tucker, 853 So.2d 104 (Miss. 2003) (holding that a fetus which had "quickened" was a person for purpose of prosecuting a wrongful death action).
Wixtrom is concerned that J.D.S.'s guardian could have authorized an abortion of the fetus. Florida law provides safeguards to insure that a guardian does not act capriciously or cavalierly when considering the health of the incapacitated mother and fetus. For example, sections 390.0111(1) and (3), Florida Statutes, state that no abortion can be performed on a ward unless two physicians certify in writing that "to a reasonable degree of medical probability, the termination of pregnancy is necessary to save the life or preserve the health of the pregnant woman," and the guardian must also consent to the medical procedure. Further, before the guardian can consent to an abortion, the guardian must receive specific authority from the court.[10] And, before the court can grant that extraordinary authority, it must appoint an attorney to represent the ward, receive independent evidence from experts, and find by clear and convincing evidence that the incapacitated person cannot make the decision and that the requested extraordinary authority is in the best interest of the incapacitated person.[11] The court may also appoint a court monitor to conduct an investigation, collect evidence, and report its findings to the court.[12]

CONCLUSION
Having concluded that Chapter 744 does not provide for the appointment of a guardian for a fetus, explicitly or implicitly, we find that the trial court correctly denied Wixtrom's petition to be appointed guardian of J.D.S.'s fetus.
AFFIRMED.
ORFINGER, J, concurs and concurs specially, with opinion.
PLEUS, J., dissents with opinion.
ORFINGER, J., concurring and concurring specially.
The unfortunate facts of this case compel us to confront a difficult question: is a fetus a "person" under Florida law?[1] "One can find no consensus on the issue among physicians, politicians, theologians, academics or judges."[2] Few topics in American law have generated as much impassioned *540 debate as the status and rights, if any, of the unborn. "[W]hen there is a "potential life" at stake, the relationship between the right to decide and the right of government to intrude becomes far more emotional and complex.... Depending on one's religious or philosophic views, life may begin anywhere from conception to ... birth."[3]
The fetal rights debate began in earnest when the United States Supreme Court declared in Roe v. Wade, 410 U.S. 113, 157-58, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a fetus is not a person for the purposes of the Fourteenth Amendment of the United States Constitution.[4] Florida, like most states, has followed the common law "born alive" rule when determining the rights, if any, of the unborn. Under that rule, the unborn generally have no legally recognized rights until, and unless, a live birth occurs. See generally State v. Ashley, 701 So.2d 338 (Fla.1997); Hernandez v. Garwood, 390 So.2d 357 (Fla.1980). American courts have also generally held that the words "person" or "human being," as used in most statutes, do not include the unborn.[5] To some extent, that view has changed slightly in Florida. For example, the Florida Legislature has addressed the killing of an unborn child by enacting section 782.09, Florida Statutes (1983), which makes the willful killing of an "unborn quick child" unlawful. But with few exceptions, Florida statutes and case law have consistently maintained that there is no "person" with any rights, standing or entitlement until there is a live birth.[6]
As the majority opinion correctly observes, through the enactment of numerous statutes, the Florida Legislature has distinguished between the unborn and persons born alive. Consequently, although the State has a legitimate interest in protecting the "potentiality of human life," an interest that becomes compelling once the unborn achieves viability, if the Legislature intends to depart from the traditional interpretation of the words "minor," "person," or "human being," as those terms are used in the guardianship or other Florida Statutes, it must do so expressly, as such words generally apply to human life only postnatally. Roe, 410 U.S. at 157, 93 S.Ct. 705.
The Legislature is the appropriate forum to debate the proper balance between the State's compelling interest in protecting the unborn and the mother's constitutional right to privacy and personal bodily integrity, assuming that such a balance can be achieved. While the debate is typically framed in the context of the State's right to interfere with a woman's decision regarding an abortion, taking control of a woman's body and supervising her conduct or lifestyle during pregnancy or forcing her to undergo medical treatment in order to protect the health of the fetus creates its own universe of troubling questions. Should the State have the authority to prohibit a pregnant woman from smoking cigarettes or drinking alcohol, both legal activities with recognized health risks to the unborn? Could the Legislature do so constitutionally given our supreme court's *541 broad interpretation of Florida's constitutional right of privacy and the limitations placed on the State's ability to act by Roe?
While Wixtrom and the amici curiae supporting her position would limit this court's ruling to situations involving a legally incompetent mother pregnant with a viable fetus, viewing the problem through that narrow a lens distorts the real issue of the scope, if any, of fetal rights. If a fetus has rights, then all fetuses have rights. And, if a fetus is a person, then all fetuses are people, not just those residing in the womb of an incompetent mother. If we recognize a fetus as a person, we must accept that the unborn would have the rights guaranteed persons under the Constitutions of the United States and the State of Florida. While it is inviting to view this case as narrowly as Wixtrom suggests, it would be dangerous to do so when the potential for state intrusion into the lives of women is so significant. The Legislature, as the people's elected representatives, must consider and weigh that delicate balance, consistent with constitutional limitations on the State's ability to interfere with a pregnant woman's right of privacy and bodily integrity.
Consistent with the holding in Roe v. Wade, the State has the authority to protect potential human life in the absence of a countervailing fundamental right or a more compelling state interest. At the same time, Roe recognized that the State's compelling interest may be sacrificed to protect the life or health of the mother. Roe, 410 U.S. at 163-64, 93 S.Ct. 705. State regulation of fundamental rights is justified only by a compelling state interest. Id. at 156, 93 S.Ct. 705. Balancing the interests of the mother and the unborn is problematic, and, at least in the context of Florida guardianship law, has not yet been addressed by the Legislature. Whether the State can confer previously unrecognized rights on the unborn under Florida law is a question that we must leave to another day. Our conclusion here is simply that the Legislature has not yet done so, at least in the context of Florida guardianship law.
Our opinion should not be read to suggest that we believe that the Legislature can constitutionally grant rights to the unborn that might be in conflict with the mother's right of privacy. Nor do we conclude that a viable fetus is not alive; rather, we hold that in the context of Florida guardianship law, the Legislature has not yet addressed the rights, if any, of the unborn, and when, if at all, a fetus acquires personhood, entitling it to the full protections of the law.[7] Whether the Legislature can confer rights on the unborn will be decided by the courts only if, and when, the Legislature enacts such legislation. But in doing so, the Legislature must consider the mother's paramount right to privacy and bodily integrity.
"Protecting the health and welfare of potential life is both an important and altruistic enterprise; one that states can and, for the sake of humanitarianism, should undertake. However, in creating laws that advance fetal protections, states should take caution to ensure preservation of our society's most sacred and fundamental interests: privacy, personal liberty, and *542 bodily integrity."[8]
PLEUS, J., dissenting.
Jennifer Wixtrom is appealing an order which denied her petition for appointment as plenary guardian of the unborn child of J.D.S. The issue in this appeal is whether a court has legislative authority to appoint a plenary guardian for the unborn child of a mentally incompetent mother to ensure compliance with statutory requirements and advance the State's interest in protecting the life of the unborn baby.
J.D.S. was pregnant as the result of a rape that occurred while she was in the care of the Department of Children and Families (DCF) in a group home. She was 22 but had the mental capacity of a four or five-year-old.
DCF filed an "Amended Petition for Emergency Adult Protective Services Intervention"[1] along with a request for appointment of plenary guardians for both J.D.S. and her unborn baby.
DCF alleged that:
Since the guardian that will be appointed for the Respondent [J.D.S.] will have a fiduciary relationship with the Respondent [J.D.S.], in that the guardian is required to act in good faith and with due regard to the needs of the vulnerable adult, these needs are potentially adverse to the interests and needs of the unborn child. The guardian for the Respondent [J.D.S.] would be prohibited from exercising this same fiduciary duty on behalf of the Respondent's [J.D.S.] unborn child. Section 415.102(10), F.S. (2003). Additionally, a guardian must avoid a conflict of interest and must be independent and impartial. Section 744.446, F.S. (2003).
Decisions will have to be made regarding the medical care, medical testing, and medications prescribed to the Respondent [J.D.S.] that are necessary to meet the needs of both the Respondent [J.D.S.] and the Respondent's [J.D.S.] unborn child and conflicts will likely arise as to these decisions. There is a possibility that the medications that the Respondent [J.D.S.] is currently taking may be detrimental to the unborn child and therefore a conflict is likely. These types of conflicts must be avoided pursuant to Chapter 415 and Chapter 744. (Id., Para. 4d)
(Emphasis added).
The trial court initially found J.D.S. to be a "vulnerable adult" in need of protective services. Upon entry of the court's order, Emelia Belford, a professional guardian,[2] petitioned to be appointed plenary guardian for J.D.S. In response to Belford's petition, the court initiated proceedings pursuant to section 744.331, Florida Statutes, to determine the competence of J.D.S.[3] It also ruled that other persons could petition to be the guardian of J.D.S. As a result of that invitation, Patti Jerrell also filed a petition to be appointed the plenary guardian of J.D.S.
The court did not rule initially on the portion of the DCF petition which asked for appointment of a plenary guardian for the unborn baby of J.D.S., but in the meantime, the appellant, Jennifer Wixtrom, filed her own verified petition to be appointed plenary guardian of J.D.S.'s baby. Her petition re-alleged the concerns *543 initially raised by DCF over the inherent conflict that would arise if the court did not appoint a guardian for the unborn child. Wixtrom stated that a guardian for the unborn child was "essential for the protection of the unborn child as J.D.S. lacks the mental capacity to provide proper pre-natal care and make the necessary decisions for the protection and enhancement of the unborn child during its formative months."
Before the court could appoint a guardian for J.D.S., DCF and the State of Florida filed a motion to intervene. They based their motion on the "constitutionally recognized interest" and the statutory responsibilities which warranted intervention. This motion was erroneously denied as "moot." The motion should have been granted, but the error was not preserved or appealed.
In the order which denied Wixtrom's petition, Judge Kirkwood noted that Wixtrom did not provide her residence address,[4] and then opined that "appointment of a guardian ad litem for a fetus is clear error." (Emphasis added).[5]
Further, for unexplained reasons, the court noted that Chapter 390 addresses the termination of pregnancies and provides that:
"Viability" means that stage of fetal development when the life of the unborn child may with a reasonable degree of medical probability be continued indefinitely outside the womb. Notwithstanding the provisions of this subsection, the woman's life and health shall constitute an overriding and superior consideration to the concern for the life and health of the fetus when such concerns are in conflict.
§ 390.0111(4), Fla. Stat. (2003). The only plausible explanation for why the court would mention Chapter 390 is that an abortion was contemplated.
The order under appeal unrealistically reasoned that the guardian for J.D.S. could resolve any "dilemma" between the interests of J.D.S. and the unborn child. On the other hand, it was silent as to who would be charged with representing the best interests of the unborn baby.
Wixtrom's petition was for her appointment as a plenary guardian under Chapter 744, and not a guardian ad litem. It is important to note the difference between a guardian ad litem and a plenary guardian appointed pursuant to Chapter 744. Under section 744.3021, any person interested in the welfare of a minor may be appointed guardian of the minor without the necessity to adjudicate the minor incompetent as set forth in section 744.331. A guardian appointed for a minor, whether of the person or property, has the authority of a plenary guardian. On the other hand, under section 39.820, a guardian ad litem is a person appointed to represent an incompetent party in civil litigation. A guardian ad litem has none of the powers of a plenary guardian and totally different responsibilities. A guardian ad litem is simply an advocate for the best interest of the child.
Upon receipt of the denial order, Wixtrom asked for a rehearing. At a hearing being held on Jerrell's and Belford's petitions to be appointed guardian of J.D.S., the trial judge announced: "The issue raised by the Executive Branch has been *544 ruled upon and will not be part of this hearing." In his written order, the judge stated:
Because the Verified Petition for Appointment of Guardian Over Unborn Child has already been denied, the stated reason for the State of Florida's and the Department of Children and Families' Motion to Intervene is moot.
The court then considered the competency petition of Patti Jerrell and Emilia Belsford. Jerrell was appointed plenary guardian of J.D.S. over Belford. Wixtrom's motion for rehearing was summarily denied without a hearing. The order was silent as to how the health and welfare of the baby would be protected.
The standard of review in this appeal is de novo because it involves a question of statutory interpretation. Casalla v. Canaveral Port Auth., 827 So.2d 308 (Fla. 5th DCA 2002).
This case is not about the choice of a mother to terminate a pregnancy, but it well could have been. J.D.S. is incapable of exercising the choice of life or death for her unborn baby. Because the baby is viable, the only question in the context of abortion would be whether the termination of the pregnancy is medically necessary to protect the life or health of J.D.S. On the other hand, as explained later, future cases may involve the termination of human life. The majority opinion would allow no voice for the unborn child in such cases.
Two preliminary issues in this tragic case merit discussion.

Mootness Issue
The question has arisen of whether the issue in this case has become moot. Baby S, a girl, was born to J.D.S. on August 30, 2003. Wixtrom and all amici agree that this case should be decided because of the likelihood of reoccurrence. Mootness does not destroy an appellate court's jurisdiction when the questions raised are of great public importance or are likely to recur. Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla.1984). The instant case meets both of these requirements. The issue of whether a court should appoint a guardian to represent the interests of an unborn child whose mother is incompetent to make decisions on behalf of the child is certainly one of great public importance. For example, the mootness issue was addressed in In re T.W., 551 So.2d 1186 (Fla.1989). In re T.W. held that an action testing the constitutionality of the parental consent statute was one of great public importance and thus, was not mooted by the teenager's abortion. A similar point was addressed in In re Fey, 624 So.2d 770 (Fla. 4th DCA 1993), which held that the issue of whether to appoint independent counsel for a ward at the outset of the proceedings was one of great public interest, and thus, was not mooted by ward's death.
The potential conflict raised by the appointment of Wixtrom is also likely to recur, as evidenced by the fact that the same issue arose in the context of a proposed abortion in In re Z.M.H., No. 03-1088 (Fla. 11th Cir.Ct. May 23, 2003). In that case, the circuit court appointed a guardian to represent an incompetent woman who was raped and became pregnant. After the guardian sought court authorization to terminate the pregnancy, the Liberty Counsel filed motions to intervene and to appoint a guardian ad litem to represent the unborn child. The circuit court denied these motions. The court then authorized an abortion. No guardian was there to advocate the interests of the unborn child. On the other side, in Lefebvre v. North Broward Hospital District, 566 So.2d 568 (Fla. 4th DCA 1990), the lower court appointed a guardian ad litem to represent an unborn child of an incompetent *545 mother in proceedings to terminate her pregnancy.
Accordingly, the birth of Baby S in the instant case does not destroy this court's jurisdiction to decide an issue of great public importance that is likely to recur.

The In re T.W. Issues
A second preliminary issue in this case is whether the outcome is controlled by In re T.W., 551 So.2d 1186 (Fla.1989). In that decision, Justice Shaw makes the statement: "We find the appointment of a guardian ad litem for the fetus was clearly improper." Id. at 1190. (Emphasis added). He went on to state that the attorney general alone has standing to pursue this appeal. Id. at 1190.
A fair reading of In re T.W. does not support the conclusion that appointment of a guardian for an unborn child is "clearly improper" in all cases. In In re T.W., a guardian ad litem (not a plenary guardian) was appointed for the sole purpose of challenging the constitutionality of certain portions of the parental consent statute. The Florida Supreme Court noted that the attorney general was the proper party to defend the parental consent law.[6]
Nothing in Justice Shaw's statement indicates that the appointment of a guardian for an unborn child is always improper. Such an interpretation is overbroad and totally unwarranted.
While In re T.W. stands for the proposition that a guardian ad litem should not be appointed for the purpose of litigating a constitutional challenge, it does not stand for the proposition that a plenary guardian should not be appointed for the viable unborn child of a mother who has been adjudicated incompetent with no capacity to formulate or communicate thoughts regarding her circumstances.

The Main Issue
At the outset it should be emphasized that the issue in this case is not about the right of a mother to choose to kill her unborn baby. J.D.S. is incapable of exercising this "choice." In the context of abortion, the only issue would be whether the termination of life for the baby is medically necessary, and that is not an issue in this case. It well could have been.
According to the majority, the issue in this case is whether Florida law allows the appointment of a plenary "fetal" guardian in cases such as this one. I would define the issue in terms of an unborn child. In other words, does the court have the power to appoint a plenary guardian for an unborn child? The majority feels the main issue is whether a "fetus" is a "person" under Florida law.
I believe that under Chapter 744, a trial court has full authority to appoint a plenary guardian for an unborn child because the child is a "minor" as the term is used in the statute.
A basic tenet of statutory construction compels a court to interpret a statute so as to avoid a construction that would result in unreasonable, harsh or absurd consequences. State v. Atkinson, 831 So.2d 172 (Fla.2002). Indeed, as Judge Sawaya of this court noted in Meeks v. Florida, Power & Light Co., 816 So.2d 1125 (Fla. 5th DCA 2002), it is the intent of the Legislature which is the polestar that guides our inquiry and requires us to interpret statutes in order to avoid an unreasonable or absurd result.
All sides to this case concede that the State has a compelling interest in the health, welfare and life of the unborn child. Appointment of a guardian for the unborn baby is not an undue burden and is the only means to ensure that the State's compelling *546 interest in the health, welfare and life of an unborn child is protected. The United States Supreme Court has ruled that a state has a legitimate interest at the outset of a pregnancy in protecting the health of a woman and the life of a fetus that may become a child. Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). This legitimate interest becomes a compelling interest after the unborn child is a viable life. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). At all times material to the decision of the trial court, Baby S was viable.
The Casey court reaffirmed Roe's definition of "viability" to be "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb so that independent existence of second life can in reason and in all fairness be the object of State protection that now overrides the rights of women." Casey, 505 U.S. at 870, 112 S.Ct. 2791. In other words, upon viability, the State has a compelling interest in "promoting the life or potential life of the unborn." To protect the health and welfare of the unborn child, states may take action to restrict a woman's liberties by any means that does not create an "undue burden." In defining what is not an undue burden, the United States Supreme Court has ruled that regulations which do no more than create a structural mechanism by which the state, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted.
Because the State has a compelling interest in a preservation of life upon viability, the trial court was obligated to determine if the appointment of a guardian over the unborn child constituted "an undue burden." In fact, there is no indication that the trial court even considered or applied the undue burden test.
The appointment of a guardian for the unborn child of a totally incapacitated ward does not constitute an undue burden. The appointment of a guardian will greatly assist the court in exercising its responsibilities of preserving the State's compelling interest in the life of the unborn child. Without the appointment of a guardian for the unborn child, there will be an inherent conflict of interest in the protection of the ward and the unborn child.
Judge Kirkwood's denial of a guardian for the baby nullified the only effective mechanism and non-burdensome method by which the State can fulfill its duty of asserting its compelling interest in preserving the health and welfare of the unborn.
Certainly the appointment of a guardian for the unborn child is no more burdensome than appointing a guardian for J.D.S. If a guardian for the baby is not appointed, the State will be left with no method of protecting the interests of the unborn child. Refusing to appoint a guardian will also place the State of Florida, by its court-appointed guardian of J.D.S., in the untenable position of deciding the fate of the unborn child in absentia, a decision which may result in the death of the unborn baby. Without the mechanism of a guardian for the unborn child, the court will have abrogated its responsibility to protect the potential life of the unborn child.
Section 744.3215(4), Florida Statutes, states in pertinent part:
Without first obtaining specific authority from the court, as described in s. 744.3725, a guardian may not:
* * *
(e) Consent on behalf of the ward to the performance of a sterilization or abortion procedure on the ward.
*547 Section 744.3725, Florida Statutes, states in pertinent part:
Before the court may grant authority to a guardian to exercise any of the rights specified in s. 744.3215(4), the court must:
* * *
(5) Be persuaded by clear and convincing evidence that the authority being requested is in the best interests of the incapacitated person; ...
The provisions of this section and s. 744.3515(4) are procedural and do not establish any new or independent right to or authority over the termination of parental rights, dissolution of marriage, sterilization, abortion, or the termination of life support systems.
(Emphasis added).
By enacting these subsections, it is abundantly clear that the Legislature intended to protect the rights of the unborn child in situations where the mother is determined to be incapacitated. It is also quite clear that these provisions require an adversarial evidentiary hearing with the presentation of evidence and a judicial determination based upon clear and convincing evidence. Inherent in these requirements is the necessity of an adversarial hearing in which not only interests of the mother are represented, but also the interests of the unborn child. This is best achieved by requiring that upon petition of the guardian of the mother for authority to abort the mother's child, a guardian for the unborn child be appointed to represent the unborn child's interest at the hearing. To construe the statute otherwise would render the requirement of a judicial determination based on clear and convincing evidence meaningless and lead to the absurdity of trying to obtain clear and convincing evidence when that evidence is exparte and uncontested. Thus, a guardian can and should be appointed for the unborn baby to ensure compliance with Florida law should abortion be considered.
There are other reasons why a guardian should be appointed. Section 744.446, Florida Statutes, creates a "fiduciary" relationship between the ward and the guardian by requiring that in the management of the guardianship, the guardian be independent and impartial. The guardian of the mother owes a complete non-compromising fiduciary relationship to the mother and the guardian is prohibited from compromising his or her duties owed to the ward by taking actions on behalf of the unborn child. This means the courtappointed guardian is placed in a "dilemma" when issues of the ward conflict with the welfare or health of the unborn child. Without a guardian for the baby, the court places the baby at the mercy of the decisions made by the court-appointed guardian. The record in this case, for example, indicates that J.D.S. is taking psychotropic medications which may jeopardize the welfare of the baby. In addition, future medical procedures such as tests and medication will be required which may detrimentally affect the baby's welfare. Matters such as whether to obtain a sonogram, use of anesthesia for medical procedures, the type of vitamins, choice of delivery, medications or other prenatal "dilemmas" will have a profound impact on the well-being of the unborn child. These issues alone create a conflict of interest that a court-appointed guardian over J.D.S. may not be able to resolve, inasmuch as the guardian owes a primary duty to J.D.S. and not to the baby. Hence, the guardian of J.D.S. is placed in an obvious conflict of interest which must be avoided.
To resolve this "dilemma" and avoid an unreasonable or absurd result, the court must have authority to appoint a plenary *548 guardian for the unborn child because the appointment of a guardian is the only structural mechanism that can watch over the unborn child's interests without creating an undue burden. It is well-established that states may regulate and even proscribe third trimester abortions except when necessary to preserve the health and life of the mother. Consistent with wellestablished federal and Florida law, Chapter 390 provides that "no termination of pregnancy shall be performed on any human being in the third trimester of pregnancy" unless certain conditions are met. In recognition of its interests in the life of the unborn child, Florida has chosen to prohibit abortions after the 24th week of pregnancy except where medically necessary to protect the life or health of the mother. § 390.0111, Fla. Stat. (2003).
The appointment of a guardian for the baby will do nothing more than create a "structural mechanism" by which the State can express its profound respect for the life of the unborn child.
The mechanism to advance that interest in the context of a case like this is the appointment of a guardian on behalf of the unborn child. The Florida Supreme Court has recognized that the judge cannot play the dual role of decision-maker and advocate. Accordingly, someone needs to represent the State's interest, and the most appropriate someone is a guardian on behalf of the unborn baby.
In this case, a guardian would be in a position to conduct his or her own analysis and review the expert's analysis as to the proper care of the unborn child which would then be presented to the trial court at the time J.D.S.'s guardian offers her report. Such a mechanism for protection would not cause a delay or in any way prejudice J.D.S. The existence of a potential inconvenience is no reason to deny the appointment of a guardian for the baby. Absent a guardian, the unborn child's voice will remain squelched, which result is contrary to the holdings and intent of Casey
The appointment of a guardian for an unborn baby of a woman in her third trimester is consistent with Roe and Casey. The appointment of a guardian on behalf of the unborn child advances the State's interest in the life of the unborn by (a) insuring compliance with all statutory requirements and (b) appointing a zealous advocate to cross-examine witnesses offering medical testimony thereby representing the State's interest in preserving the life of the unborn child. In this case, the only interests at stake are the State's interest in preserving the life of the unborn child and the guardian's interest in determining whether it is medically necessary to terminate the pregnancy in order to preserve the life or health of the mother. Absent clear and convincing evidence that the mother's life or health is at risk due to the continued pregnancy, the scale tips in favor of the State and the life of the unborn baby must be preserved. A guardian on behalf of the unborn baby would act as an advocate for the State's interest in that unborn life.
Because the majority concludes that an unborn, viable child is not a "person" or a "minor" unless the Legislature says so, I would urge the Legislature to overturn this decision and affirm the fact that an unborn child is a person. Such action would be a clear and unambiguous acknowledgment of human life.
I would submit further that defining "person" by using terms such as "embryo" or "fetus" is confusing, outdated and meaningless. Such terms cloud the issue of when human life begins. The better view would be for the Legislature to adopt a bright line point in time, and that point in time must be the moment of conception.
*549 Sooner or later, as happened when Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) overturned Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), Roe's unrestricted abortions will be overturned, and the rights of the unborn will be extended to the moment of conception.
My concern with the ramifications of the majority opinion compels me to write the following. I have a new grandson. His name is Nicholas. His heart started beating a short time after conception and during the first trimester. At the end of the first trimester, or early in the second trimester, we were able to view a sonogram and determine that Nicholas was a boy. We have pictures of sonograms taken when Nicholas was only fourteen weeks old. You can see his head, his eyes, his hands and feet. You could tell he was alive because he moved his arms and legs. He was so strong you could watch him move his mother's pregnant belly. Before he was born, his parents placed a sign over his future crib. It read simply: "NICHOLAS." Nicholas now lives outside his mother's womb, but from the moment of his conception, Nicholas was a human life.
If all the judges in the world and all justices on the supreme court decided that Nicholas was not a person and merely a "fetus" until his birth, I would know them blind to reality. Before his birth, Nicholas was alive. Nicholas had identity. Nicholas was a person. Nicholas has been a person since conception. Our rule of law can no longer remain blind to the realities of human life.
We now know the baby of J.D.S. is a girl. She is called Baby S. She was born through Caesarean section. Ironically, within a short time after her birth, a guardian was appointed for Baby S. It makes no sense to me that Baby S could have a guardian after the Caesarean but not before. Was Baby S any less human before the surgery?
For the reasons expressed above, the issue in this case can be resolved on the basis of legislative intent. I believe the Legislature intended the reality that Baby S was a minor under the age of 18 both before and after the Caesarean operation on her mother. As a minor under the age of 18, prior to her birth, Baby S was eligible for a plenary guardian under the statute. Such a ruling would not amount to judicial legislation. Holding that an unborn child is a minor under the age of 18, within the context of the overall purpose of Chapter 744, is simply judicial interpretation, with a view to reality, in order to avoid an unreasonable and absurd result.
NOTES
[1] The State of Florida and the Department of Children and Family Services filed a joint amicus brief in support of Wixtrom. Right To Life, Inc., also filed an amicus brief in support of Wixtrom. The Center for Persons with Disabilities, the American Association of Disabled People, the American Civil Liberties Union, the American Civil Liberties Union of Florida, the Florida National Organization for Women, Inc., and the Center for Reproductive Rights filed amicus briefs in opposition to Wixtrom.
[2] In re T.W., 551 So.2d 1186, 1190 (Fla.1989); Hernandez v. Garwood, 390 So.2d 357, 358 (Fla.1980); Duncan v. Flynn, 358 So.2d 178, 178 (Fla.1978); Stern v. Miller, 348 So.2d 303, 308 (Fla.1977); Love v. State, 450 So.2d 1191, 1193 (Fla. 4th DCA 1984); and Styles v. Y.D. Taxi Corp., Inc., 426 So.2d 1144, 1145 (Fla. 3d DCA 1983).
[3] The trial court found:

1) The nature and scope of the Ward's incapacities are: severe mental retardation, cerebral palsy with a history of autism.
2) The following facts demonstrate that the Ward is totally without capacity to care for the Ward's person or property: The ward may respond to verbal or visual stimuli or follow commands. She is unable to communicate and unable to make her needs known. She requires assistance with ambulation and requires total assistance with all activities of daily living. She cannot hold a pen, cannot write, doesn't know her name or very basic information. She is unable to follow simple commands [sic] and is unable to express basic needs. Her intellectual deficit and inability to make her needs known significantly impairs her ability to make informed decisions in all areas of her life.
3) The Ward lacks total capacity to make informed decisions about care and treatment or to meet the essential requirements for the Ward's physical or mental health or safety; is subject to total legal disability; is incapable of exercising any rights; and a guardian must exercise all delegable rights of the Ward and have full powers and duties with respect to the Ward and the Ward's person and property....
[4] The Department and the Attorney General did not appeal the trial court's order denying intervention, thereby waiving the right to contest the court's ruling on intervention.
[5] The attorney representing J.D.S. filed a Suggestion of Birth with this court on 12 September 2003:

1. That on Saturday, August 30, 2003 at 10:00 o'clock a.m. in Orange County, Florida, J.D.S. gave birth by cesarean section to a baby girl known as Baby S.
2. Baby S weighed 6 pounds, 7 ounces and her length was 21½ inches.
[6] § 744.102(8), Fla. Stat. (2003).
[7] § 744.102(19), Fla. Stat. (2003).
[8] § 768.19, Fla. Stat. (1993).
[9] § 827.04(1), Fla. Stat. (1987).
[10] § 744.3215(4)(e), Fla. Stat. (2003).
[11] § 744.3725, Fla. Stat. (2003).
[12] § 744.107, Fla. Stat. (2003).
[1] The terms "human being" and "person" are used herein interchangeably, as are the terms "unborn child" and "fetus."
[2] William E. Buelow III, To Be And Not To Be: Inconsistencies in the Law Regarding the Legal Status of the Unborn Fetus, 71 Temp. L.Rev. 963, 963 (Winter 1998).
[3] Charlene Carres, Legislative Efforts to Limit State Reproductive Privacy Rights, 25 Fla. St. U.L.Rev. 273, 273 (Winter 1998).
[4] Aaron Wagner, Texas Two-Step: Serving Up Fetal Rights By Side-Stepping Roe v. Wade Has Set the Table for Another Showdown on Fetal Personhood in Texas and Beyond, 32 Tex. Tech L.Rev. 1085, 1090 (2001).
[5] Alan S. Wasserstrom, Homicide Based on Killing of Unborn Child, 64 A.L.R. 5th 671 (1998).
[6] Charlene Carres, Legislative Efforts to Limit State Reproductive Privacy Rights, 25 Fla. St. U.L.Rev. 273, 274 (Winter 1998).
[7] I do not suggest that in considering the welfare of an incapacitated pregnant woman, the guardianship court should ignore the well-being of the fetus. To the contrary, I believe the guardianship court has the authority and obligation to consider the fetus's wellbeing, although the mother's life and health must trump concern for the welfare of the fetus, if those interests are irreconcilable. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
[8] Amy Kay Boatright, State Control Over the Bodies of Pregnant Women, 11 J. Contemp. Legal Issues 903, 903 (2001).
[1] § 415.1051 (2), Fla. Stat. (2003).
[2] § 744.1085, Fla. Stat. (2003).
[3] Under section 744.3021, such a procedure is not required in cases involving persons under 18 years of age.
[4] The reason Wixtrom did not give her address was explained in her motion for rehearing by the fact that, under Florida law, she is not required to do so as the spouse of a state attorney.
[5] This statement is an obvious reference to a statement made by Justice Shaw in In re T.W., 551 So.2d 1186 (Fla.1989).
[6] This holding lends support to the State's motion to intervene.